Matter of Mancini v Office of Children & Family Servs. (2018 NY Slip Op 08425)

Matter of Mancini v Office of Children & Family Servs.

2018 NY Slip Op 08425 [32 NY3d 521]

December 11, 2018

DiFiore, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, March 13, 2019

[*1]

In the Matter of Steven G. Mancini, Appellant,
v
Office of Children and Family Services et al., Respondents. Workers' Compensation Board, Respondent.

Argued November 13, 2018; decided December 11, 2018

Matter of Mancini v Office of Children & Family Servs., 151 AD3d 1494, affirmed.

{**32 NY3d at 523} OPINION OF THE COURT

Chief Judge DiFiore.

Workers' Compensation Law § 15 (3) (v) permits certain permanently partially disabled workers who have exhausted their schedule awards to apply for "additional compensation." In this appeal, we must determine whether such awards are subject to the durational limits contained in section 15 (3) (w). We hold that they are and, therefore, affirm.
I.
In 2008, claimant Steven Mancini, then age 40, sustained injuries while working as an aide at a facility run by respondent Office of Children and Family Services (OCFS), whose carrier is respondent State Insurance Fund. The following year, a Workers' Compensation Law Judge (WCLJ) found that claimant had suffered a 50% loss of use of his left arm and{**32 NY3d at 524} was, therefore, entitled to a 156-week "schedule loss of use" award pursuant to Workers' Compensation Law § 15 (3) (a)-(u), the statutory schedule providing wage-based compensation for permanent partial disability arising from injury to certain body parts and for serious facial or head disfigurement. Claimant did not return to his OCFS position but [*2]completed a rehabilitation program and ultimately secured different employment. When his schedule loss of use award was exhausted, claimant applied for and was awarded additional compensation under Workers' Compensation Law § 15 (3) (v) (paragraph [v]). Paragraph (v) incorporates by reference the subsequent provision—Workers' Compensation Law § 15 (3) (w) (paragraph [w])—for calculation of the benefit available to a qualifying injured worker, stating that paragraph (v) "additional compensation shall be determined in accordance with paragraph w."
At the hearing on claimant's application, an issue arose regarding which portions of paragraph (w)'s framework for calculating benefits apply to an additional compensation award under paragraph (v). Respondent State Insurance Fund argued that additional compensation awards are subject to durational limits in paragraph (w) setting forth the maximum number of weeks a claimant may receive payment based on percentage of lost wage-earning capacity. The WCLJ determined that paragraph (v) incorporates only the paragraph (w) formula for determining the sum of each weekly payment and not the portion of paragraph (w) stating the number of weeks the benefits are to be awarded. However, respondent Workers' Compensation Board rejected that interpretation and concluded that paragraph (w)'s durational limits apply to paragraph (v) additional compensation awards. Following further proceedings, the Board ultimately determined, among other things, that claimant lost 37.5% of his wage-earning capacity and was thus entitled, based on the paragraph (w) calculation, to 275 weeks of additional compensation under paragraph (v) due to the injury to his arm. Claimant applied for reconsideration and/or full Board review, which was denied.
On cross appeals, the Appellate Division affirmed the Board's decision (151 AD3d 1494, 1496 [3d Dept 2017]). Citing pertinent legislative history and the plain text of paragraph (v), the Appellate Division rejected claimant's argument that paragraph (v) incorporates only paragraph (w)'s formula for determining a weekly payment (id.). The Appellate Division explained that "the statutory language does not prohibit application {**32 NY3d at 525}of [paragraph (w)] to the durational period of benefit payments" under paragraph (v) and thus concluded, among other things, that the Board's determination was rational (id.).
On claimant's appeal by leave of this Court, claimant argues that paragraph (v) incorporates only paragraph (w)'s formula for calculating the weekly payment amount and not paragraph (w)'s durational component setting forth the number of weeks that sum is paid. Respondents argue that paragraph (v) incorporates by reference the entirety of paragraph (w)'s framework for calculating benefits, including its durational limits. We agree with respondents.
II.
"As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof" (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]). Further, provisions of an integrated statutory scheme must be considered as a whole, with each component viewed in relation to the others (Ace Fire Underwriters Ins. Co. v Special Funds Conservation Comm., 28 NY3d 1084, 1086 [2016], citing Matter of Shannon, 25 NY3d 345, 351 [2015]). Thus, in order to determine how additional compensation is to be calculated, we must review the plain text of paragraph (v) in the context of the workers' compensation benefit system for permanent partial disability. Our analysis therefore begins with an overview of Workers' Compensation Law § 15 (3), which provides the framework for determining permanent partial disability benefits.
Workers' Compensation Law § 15 "provides compensation for four different types of injury: permanent total disability, temporary total disability, permanent partial disability and temporary partial disability" (Matter of LaCroix v Syracuse Exec. Air Serv., Inc., 8 NY3d 348, 353 [2007], citing Workers' Compensation Law § 15 [1], [2], [3], [5]). A worker who suffers a permanent partial disability typically qualifies for one of two broad categories of primary award under Workers' Compensation Law § 15 (3)—referred to colloquially as a "schedule loss of use" award or a "non-schedule" benefit—depending on the nature of the injury (see Matter of Raynor v Landmark Chrysler,{**32 NY3d at 526} 18 NY3d 48, 54 n 2 [2011]).[FN*][*3]"Schedule loss of use" awards for permanent partial disability are determined under Workers' Compensation Law § 15 (3) (a)-(u), which generally "assigns—as by a 'schedule'—a fixed number of lost weeks' compensation according to the bodily member [or sensory organ] injured" (LaCroix, 8 NY3d at 353). A worker who suffers permanent partial disability as a result of loss (or loss of use) of one of the listed body parts or senses is entitled to an award amounting to a weekly payment of two thirds of the average weekly wages prior to the injury for the number of weeks attributed to their type of injury in the schedule (see e.g. Workers' Compensation Law § 15 [3] [a] [loss of an arm entitles a claimant to 312 weeks of benefits]). Paragraph (w) of section 15 (3) provides what have been dubbed "non-schedule" benefits for workers with permanent partial disabilities arising from injuries not listed in section 15 (3) (a)-(u). Under paragraph (w), the weekly compensation award is two thirds of the difference between the injured worker's average weekly wages prior to the injury and the worker's earning capacity after the injury. Paragraph (w) also specifies the number of weeks the worker will receive that weekly sum, based on the percentage of lost wage-earning capacity. For example, the number of weeks that benefits may be received is capped at 525 where the loss of earnings is greater than 95% (see Workers' Compensation Law § 15 [3] [w] [i]).
Under paragraph (v), a subcategory of schedule award recipients—those who suffer a 50% or greater loss or loss of use of an arm, leg, hand or foot—can apply for "additional compensation" after the expiration of the schedule award (Workers' Compensation Law § 15 [3] [v]). As we explained in Matter of Ramroop v Flexo-Craft Print., Inc., to be entitled to additional compensation "claimant[s] must fulfill two requirements": establish that their impairment of wage-earning capacity is due solely to the injury and participate in a Board-approved rehabilitation program (or cooperate with efforts to institute such a program and be deemed by the Board not a{**32 NY3d at 527} candidate for rehabilitation) (11 NY3d 160, 167 [2008]). Paragraph (v) does not include a formula or schedule for determining the amount of additional compensation available, but states that "[s]uch additional compensation shall be determined in accordance with paragraph w of this subdivision"—the provision addressing calculation of non-schedule permanent partial disability benefits (Workers' Compensation Law § 15 [3] [v]). Lastly, paragraph (v) states that an additional compensation award "shall cease on the date the disabled employee receives or is entitled to receive old-age insurance benefits under the social security act" (Workers' Compensation Law § 15 [3] [v]).
Claimant asserts, despite the cross-reference to paragraph (w), that only a part of that paragraph—the formula for determining the weekly benefit—is applicable to additional compensation awards under paragraph (v). He therefore maintains that he is entitled to additional compensation until he is eligible for age-based Social Security benefits. But the plain text of paragraph (v) adopts, without qualification, paragraph (w)'s process for determining the size and scope of a disability award. Indeed, the term "compensation," used in paragraph (v), is broadly defined as "the money allowance payable to an employee or to his dependents" (Workers' Compensation Law § 2 [6] [emphasis added]). The use of this term thus contemplates the application of any and all parts of paragraph (w) that impact the overall benefit owed to the worker—such as language limiting the number of weeks that benefits will be paid. After all, the duration of weekly benefits affects the total amount of "the money allowance payable." Therefore, the plain text of paragraph (v) incorporates the entirety of paragraph (w)'s framework for calculating benefits, including both the paragraph (w) formula for determining a weekly benefit payment and the portion of that provision setting the maximum number of weeks the sum is to be paid.
Contrary to claimant's position, nothing in the language of paragraph (v) regarding termination of additional compensation upon eligibility for age-based Social Security benefits contradicts paragraph (w)'s durational restrictions or precludes their application to paragraph (v) recipients. By incorporating the entirety of paragraph (w)'s framework for calculating benefits, paragraph (v) provides additional compensation lasting a maximum number of weeks as a supplement to the schedule award the worker already received. Paragraph (v)'s requirement{**32 NY3d at 528} that such payment terminates if the worker becomes eligible for age-based Social Security payments (regardless of how many weeks have passed) merely places another limit, where applicable, on the additional compensation a claimant can receive. Put another way, once claimants are entitled to age-based Social Security benefits, they are no longer eligible to [*4]receive additional compensation even if they have not yet reached the maximum number of weeks applicable under paragraph (w). There is no inherent conflict between the weeks-based component of paragraph (w) and the termination provision. Here, for example, there is no overlap between the durational provisions and the termination provision. Claimant was 46 at the time of the additional compensation award, and his 275 weeks of payments will thus expire when he is 51—long before he will become eligible for age-based Social Security benefits.
Indeed, neither of the primary benefits that section 15 (3) provides are open-ended. Both schedule loss of use awards and non-schedule benefits continue for a maximum number of weeks, depending on the nature or severity of the worker's disability. Interpreting paragraph (v) to grant a subset of recipients open-ended benefits limited only by eligibility for age-based Social Security payments—an award that would potentially span their working lifetimes—would uniquely benefit that small group above all other permanent partial disability award recipients. There is no textual support for such an exceptional interpretation. Rather, under the plain language of paragraph (v), additional compensation awards are calculated pursuant to the formula and durational provisions of paragraph (w), terminating earlier if or when a claimant becomes eligible for age-based Social Security benefits.
III.
This conclusion is supported by the legislative history of the relevant provisions. When the legislature enacted paragraph (v) in 1970, it sought to address the disparity between the treatment of the two classes of beneficiaries receiving permanent partial disability compensation—schedule loss of use award recipients and non-schedule benefit recipients. Then—like now—workers receiving schedule loss of use awards under section 15 (3) (a)-(u) generally received benefits for a specific number of weeks that varied depending on which body part or sensory organ they injured. Since paragraph (v) did not yet exist,{**32 NY3d at 529} even employees who suffered very severe injuries entitling them to schedule awards—such as almost complete loss of an arm or leg—received an award of limited duration. However, at that point—unlike now—non-schedule benefits under paragraph (w) lasted potentially for life, as long as the employee's earning capacity was impaired and the employee could show the requisite attachment to the labor market (see Raynor, 18 NY3d at 54; see also Burns v Varriale, 9 NY3d 207, 216 [2007] [a permanently partially disabled claimant was required to "demonstrate that his or her reduced earning capacity (was) due to the disability, not age, general economic conditions or other factors unrelated to the disability" 
(internal quotation marks and citation omitted)]).
The legislature viewed this durational disparity as unfair and adopted paragraph (v) in 1970 to give a limited subset of severely injured schedule award recipients an opportunity to apply for additional compensation that would place them roughly on par with non-schedule benefit recipients. The Governor's Program Bill Memorandum noted there were "many documented cases of hardship and inequity" and stated that the "bill would remedy future similar situations" by "treat[ing] the most serious of the 'schedule awards' (loss of an arm, hand, leg or foot) in a fashion comparable to other forms of permanent partial disability" (Governor's Program Bill Mem No. 124 at 2, Bill Jacket, L 1970, ch 286). To that end, the legislature drafted paragraph (v) with an explicit and unlimited incorporation of paragraph (w), thus permitting those with serious schedule-award injuries to apply for an additional compensation award similar in scope to the benefits received by those with non-schedule injuries. To be sure, since paragraph (w) provided a potentially open-ended benefit at that point in time, by incorporating paragraph (w)'s calculation scheme in paragraph (v), the 1970 legislature achieved greater parity by providing paragraph (v) recipients with a similar potential to receive an extended benefit (subject to the paragraph [v] restriction that compensation terminate when the employee becomes eligible for age-based Social Security benefits).
However, in 2007, the legislature enacted workers' compensation reform legislation that "capped the number of weeks that a person is eligible to receive benefits for a non-schedule permanent partial disability" (Raynor, 18 NY3d at 54). In this respect, non-schedule benefits became comparable to most schedule awards, in that both types of primary award are now{**32 NY3d at 530} generally payable at most for a specified number of weeks based on the "schedule" or durational provisions set forth in the pertinent subsections of the statute. It is clear from the legislative history that the 2007 amendment of Workers' Compensation Law § 15 (3) (w) in particular was intended to reduce costs for employers and carriers (see Governor's Program Bill Mem No. 9, Bill Jacket, L 2007, ch 6, at 18, 2007 NY Legis Ann at 5-6; Assembly Introducer's Mem in Support, Bill Jacket, L 2007, ch 6 at 30-31). However, the legislative history also indicates that the amendment to paragraph (w) was—like the enactment of paragraph (v) in 1970—intended to create greater parity among the different classes of [*5]permanent partial disability benefit recipients (Governor's Program Bill Mem No. 9, Bill Jacket, L 2007, ch 6, at 16-17; Assembly Introducer's Mem in Support, Bill Jacket, L 2007, ch 6 at 30). Indeed, both the Governor's Program Bill Memorandum and Assembly Introducer's Memorandum reference the disparity in the then-existing statutory scheme, which "provide[d] for a schedule of benefits for certain injuries classified as 'permanent partial disabilities' but not for other injuries in the same classification, resulting in a set duration of benefits [only] for some claimants" (Bill Jacket, L 2007, ch 6 at 16, 30). Thus, by adding a durational component to paragraph (w), the legislature sought to curtail costs and remedy unfairness resulting from the fact that only one group had previously been eligible for potentially open-ended benefits.
In amending paragraph (w), the legislature necessarily altered the operation of paragraph (v), which expressly incorporates paragraph (w) without limitation. Claimant argues that, if the legislature intended to incorporate an additional durational component into the framework for calculating paragraph (v) awards, it could have explicitly stated this intent. But, there was simply no need for the legislature to add language to paragraph (v) to reflect changes in paragraph (w) because paragraph (v) already wholly incorporated paragraph (w)'s compensation regime.
Finally, we note that in 1970, when it enacted paragraph (v), and in 2007, when it amended paragraph (w) to impose durational restrictions, the legislature sought to reduce unfairness and create greater parity among different classes of permanent partial disability benefit recipients by reducing disparities between the scope of available benefits. Thus, under the current statutory scheme, claimants with permanent partial disabilities{**32 NY3d at 531} generally receive benefits that are capped at a maximum number of weeks. Adopting claimant's interpretation of the statute would effectively perpetuate the very unfairness that the legislature sought to eliminate, now by permitting only paragraph (v) claimants to receive extended benefits. Therefore, the Appellate Division correctly concluded that the durational provisions of paragraph (w) apply to paragraph (v) additional compensation awards and, thus, claimant's additional compensation benefits were properly computed by the Board.
Accordingly, the order of the Appellate Division, insofar as appealed from, should be affirmed, with costs.

Wilson, J. (dissenting). I see no ambiguity whatsoever in Workers' Compensation Law § 15 (3) (v) and (w). In paragraph (v), the legislature specified "additional compensation" to be provided to persons like Mr. Mancini, who suffered one of the four most severe scheduled losses (greater than 50% loss of use of a leg, arm, hand or foot), "[n]otwithstanding any [*6]other provision" of section 15 (3) (Workers' Compensation Law § 15 [3] [v]). Instead of following the legislature's clear command, the majority takes a durational provision that the legislature expressly limited to "all compensation payable under this paragraph"—paragraph (w)—and applies it to paragraph (v) (Workers' Compensation Law § 15 [3] [w]). That is no way to read a statute.
I.
For a set of itemized partial (>50%) permanent disabilities caused by workplace accidents, ranging in severity from loss of use of an arm (biggest award) to loss of use of one's fourth finger (smallest award; loss of use of your little finger is not severe enough to entitle you to a schedule loss of use award), the Workers' Compensation Law provides temporary benefits. In 1970, for the four most severe schedule loss of use award categories (loss of use of an arm, leg, hand or foot), the legislature enacted paragraph (v) to provide additional compensation to persons suffering one of those four injuries in the workplace. The paragraph (v) additional compensation does not start until the schedule loss of use payments have run out. For example, a person suffering a permanent partial loss of use of her leg would be entitled to 51/2 years of schedule loss of use payments. When those payments stop, paragraph (v)'s additional compensation{**32 NY3d at 532} might begin. However, the additional compensation payments are subject to two qualifications that do not apply to the schedule loss of use payments. First, the permanent partial disability must be the sole cause of a current impairment in earning capacity, otherwise no additional compensation would be provided. Second, the additional compensation ends as soon as the person is eligible to receive Social Security benefits for old age.
Here is the relevant text of paragraph (v), with the determinative language italicized:
"Additional compensation for impairment of wage earning capacity in certain permanent partial disabilities. Notwithstanding any other provision of this subdivision, additional compensation shall be payable for impairment of wage earning capacity for any period after the termination of an award under paragraphs a, b, c, or d, of this subdivision for the loss or loss of use of fifty per centum or more of a member, provided such impairment of earning capacity shall be due solely thereto. Such additional compensation shall be determined in accordance with paragraph w of this subdivision[,] . . . and shall cease on the date the disabled employee receives or is entitled to receive old-age insurance benefits under the social security act" (Workers' Compensation Law § 15 [3] [v] [emphasis added]).
The legislature has never modified the text of paragraph (v) since its enactment.
In 2007, the legislature did modify a different paragraph, paragraph (w), which specifies the compensation for "all other cases of permanent partial disability"—that is, injuries "other" than those appearing in the schedule (for example, a partial back injury or a partial loss of use of your little finger). As the majority notes, the legislature did so by changing those awards from lifetime awards to awards of limited duration. Here is the full text of paragraph (w) as it now exists, again with the determinative language italicized:
"In all other cases of permanent partial disability, the compensation shall be sixty-six and two-thirds percent of the difference between the injured employee's average weekly wages and his or her wage-{**32 NY3d at 533}earning capacity thereafter in the same employment or otherwise. Compensation under this paragraph shall be payable during the continuance of such permanent partial disability, without the necessity for the claimant who is entitled to benefits at the time of classification to demonstrate ongoing attachment to the labor market, but subject to reconsideration of the degree of such impairment by the board on its own motion or upon application of any party in interest however, all compensation payable under this paragraph shall not exceed (i) five hundred twenty-five weeks in cases in which the loss of wage-earning capacity is [*7]greater than ninety-five percent; (ii) five hundred weeks in cases in which the loss of wage-earning capacity is greater than ninety percent but not more than ninety-five percent; . . . and (xii) two hundred twenty-five weeks in cases in which the loss of wage-earning capacity is fifteen percent or less" (Workers' Compensation Law § 15 [3] [w] [emphasis added]).
The majority takes the durational limitations at the end of paragraph (w) and engrafts them onto paragraph (v); in doing so, it misconstrues paragraph (v)'s "determined in accordance with" clause and ignores the clear contrary statements in both paragraphs (v) and (w). That reading is wholly unsupportable. When paragraph (v) was adopted, paragraph (w) had no durational limit. Consequently, paragraph (v)'s statement that the "additional compensation" provided thereunder be "determined in accordance with paragraph w" could have referred, at the time, only to the method of calculating the amount of the payment. The majority's claim that the durational requirement later added to paragraph (w) should be engrafted into paragraph (v) runs contrary to numerous clear provisions contained in those paragraphs.
First, the time-limitation language the legislature added to paragraph (w) is expressly confined to all compensation "payable under this paragraph." The "additional compensation" payable under paragraph (v) is not the compensation payable under paragraph (w). Note that the formula for calculating the amount of compensation in paragraph (w) is not limited to compensation "payable under this paragraph," whereas the durational limit is. Thus, the legislature expressly stated when{**32 NY3d at 534} amending paragraph (w) that its durational limits pertained to compensation "payable" under that paragraph only, whereas the computational method—alone—remained incorporated into paragraph (v).
Second, paragraph (v) expressly states that eligible persons are entitled to the "additional compensation" provided thereunder "[n]otwithstanding any other provision of this subdivision"; paragraph (w) is such an "other provision." We have to assume the legislature meant what it said when it said "notwithstanding," and knew how to strike that clause if it wanted to do so. If the legislature had wanted to say something different, "it easily could have and surely would have written the statute to say so" (Matter of Theroux v Reilly, 1 NY3d 232, 240 [2003]).
Third, paragraph (v) contains its own specific time restriction applicable only to the payments made thereunder. Those payments continue until the injured person becomes eligible for old-age Social Security benefits. Our rules of statutory construction do not allow us to incorporate a more general provision to obliterate a specific one (see Matter of Perlbinder Holdings, LLC v Srinivasan, 27 NY3d 1, 9 [2016] ["Under principles of statutory construction, whenever there is a general and a specific provision in the same statute, the general applies only where the particular enactment is inapplicable"]; see also McKinney's Cons Laws of NY, Book 1, Statutes § 238).
Fourth, paragraph (v) provides additional compensation "for any period" after a paragraph (a)-(d) schedule loss of use award has ended—not just immediately after the expiration of a schedule award. The "for any period" language works in tandem with paragraph (v)'s limitation on additional compensation—that it is only provided: (i) during a period of time when the claimant experiences a loss of earning capacity; and (ii) when that loss is solely attributable to the workplace injury. Thus, paragraph (v) additional compensation—unlike either the schedule or non-schedule compensation—can be provided intermittently, for periods when a loss of earning capacity is directly caused by a workplace injury, even if the compensation was not available in prior periods.
The plain reading of paragraphs (v) and (w) is that paragraph (v) provides additional compensation, notwithstanding paragraph (w) or any other paragraph, in an amount determined by the formula provided in paragraph (w), for losses of wage earning capacity solely attributable to the paragraph (a)-(d) schedule{**32 NY3d at 535} loss of injury, until the injured employee is eligible to receive old-age Social Security benefits.
The majority voices concern that, unless the time limits from paragraph (w) are imposed onto paragraph (v) benefits, the additional compensation will "uniquely benefit" partially permanently disabled workers with a paragraph (a)-(d) award over all others receiving permanent partial disability benefits (majority op at 
528). But the Workers' Compensation Law is a hierarchy of benefits unique to each type of workplace injury: total disability is greater than partial; loss of a hand is worse than loss of an eye is worse than loss of a thumb is worse than loss of a ring finger. Paragraph (v) is the legislature's expression of yet another benefit unique to a defined class: injured workers who [*8]suffer one of the four most severe permanent partial disabilities (Workers' Compensation Law § 15 [3] [a]-[d]) will be treated less well than those who suffer a permanent total disability (and receive lifetime benefits), but better than those whose schedule disability is less severe (Workers' Compensation Law § 15 [3] [e]-[s]), and potentially better than those whose partial disability is non-schedule. By enacting paragraph (v), the legislature chose to afford workers suffering the most severe schedule injuries "additional compensation": less than what they would have received had the disability been total, but more than what less severely injured workers might receive. That "unique benefit" is what the legislature enacted, which the majority now spurns.
II.

Because the statute is clear on its face, we would not alter the plain meaning based on the legislative history, unless the plain language produced an absurd result or a conflict with some other statute (see People v Roberts, 31 NY3d 406, 418 [2018] ["If the words chosen have a definite meaning, which involves no absurdity or contradiction, then there is no room for construction and courts have no right to add or take away from that meaning" 
(citations and internal quotation marks omitted)]). In any event, the legislative history does not support the majority's interpretation of the statute.
The majority correctly notes that the legislature added paragraph (v) to address a perceived inequity between schedule benefits, which were capped at a certain duration, and non-schedule benefits, which workers could receive for life. Under the prior legislative scheme, a worker with a schedule loss{**32 NY3d at 536} received workers' compensation benefits for a limited period of time, even if the related loss of wages was perpetual. But the legislature did not equalize that inequity. It left the inequity in place for all schedule loss of use awards except the four most severe; even for those, it did not equalize them but instead created a completely different award structure, in which the "additional compensation" did not last a lifetime and was dependent on the injury being the sole cause of the loss of wage-earning capacity. The legislature's 2007 amendment, which ended the lifetime awards for non-schedule recipients, likewise did not equalize the payments for schedule and non-schedule injuries but created a new set of time limits for non-schedule awards. The notion that the legislature, either in 1970 or 2007, was attempting to make all awards equal, or even equivalent, is not borne out by the legislation or the legislative history. Being motivated by an inequality is different than equalizing.
The majority is also correct that the 2007 legislature imposed the durational requirements on non-schedule payments because it wanted to amend paragraph (w) to "dramatically reduc[e] costs in the workers' compensation system" (Governor's Program Bill Mem No. 9, Bill Jacket, L 2007, ch 6 at 5, 2007 NY Legis Ann at 5). When the legislature amended paragraph (w) to say that the benefits payable under that paragraph—all non-schedule benefits—would no longer continue for life, it reduced program costs to employers and insurance companies by an estimated $822 million annually (see Julia Ostrov, An Examination of the New York State Workers' Compensation Reform Act of 2007, 42 W Mich U J of Soc & Soc Welfare, Issue 3, Article 2 at 11 [2015]). But it strains credulity to believe that the legislature's cost-saving motive should cause the Court to disregard the plain statutory language limiting the durational caps to awards payable under paragraph (w), and to force those caps onto paragraph (v)—particularly because counsel for the Workers' Compensation Board advised us at oral argument that paragraph (v)'s "additional compensation" is raised in a "single digit" number of cases each year. The majority points to nothing in the legislative history stating that the legislature intended to limit or reduce paragraph (v)'s "additional compensation" to save money, or for any other reason.
If the statutory text were unclear or ambiguous, the legislative history would be of little assistance. Here, the statutory language is so clear and emphatic, in a belt-and-suspenders way, that I do not see how it can be read to curtail Mr. Mancini's{**32 NY3d at 537} additional compensation. For the foregoing reasons, I would reverse and hold that the durational limits in paragraph (w) of the Workers' Compensation Law do not apply to the additional compensation established under paragraph (v).
Judges Rivera, Stein, Fahey, Garcia and Feinman concur; Judge Wilson dissents in an opinion.
Order, insofar as appealed from, affirmed, with costs.

Footnotes

Footnote *:Although under the statute, taken at "face value, . . . all awards for disability [could be said to] constitute 'schedule' awards," the term " 'schedule award' . . . evolved [long ago] as a much narrower phrase of art encompassing compensation allowed for specified permanent partial disabilities in which the loss or the loss of use of a member of the body listed in [Workers' Compensation Law § 15 (3)] has occurred" (Matter of Landgrebe v County of Westchester, 57 NY2d 1, 6 [1982] [footnote omitted]).