# State of New York
# Court of Appeals

## OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 50
John Kuzmich, et al.,
    Appellants,
      v.
50 Murray Street Acquisition LLC,
    Respondent.
--------------------------------------------
No. 51
William T. West, et al.,
    Appellants,
      v.
B.C.R.E. - 90 West Street, LLC,
    Respondent,
Lee Rosen,
    Defendant.

Case No. 50:
Robert S. Smith, for appellants.
James M. McGuire, for respondent.
Metropolitan Council on Housing; The Real Estate Board of New York, amici curiae.

Case No. 51:
Robert S. Smith, for appellants.
Magda L. Cruz, for respondent.

STEIN, J.:

The question presented on these appeals is whether plaintiffs' apartments, which are located in buildings receiving tax benefits pursuant to Real Property Tax Law (RPTL) § 421-g, are subject to the luxury deregulation provisions of the Rent Stabilization Law

(RSL) (see generally Rent Stabilization Law of 1969 [Administrative Code of City of New York § 26-504.1]). We conclude that they are not and, therefore, reverse.

I

In each of these cases, plaintiffs are individual tenants of rented apartments located in lower Manhattan, which are owned by defendants, 50 Murray Street Acquisition LLC or B.C.R.E. – 90 West Street, LLC.[1] Defendants have received certain tax benefits pursuant to section 421-g of the RPTL in connection with the conversion of their buildings from office space to residential use. In these actions, plaintiffs seek, among other things, a declaration that their apartments are subject to rent stabilization. Plaintiffs allege that defendants failed to treat the apartments as rent stabilized even though the receipt of benefits under RPTL 421-g is expressly conditioned upon the regulation of rents in the subject buildings. Defendants maintain that plaintiffs' apartments are exempt from rent regulation under the luxury deregulation provisions added to the RSL as part of the Rent Regulation Reform Act of 1993.[2]

Supreme Court, in separate orders penned by two different Justices, denied defendants' motions for summary judgment and granted plaintiffs' cross-motions declaring that the apartments are subject to rent stabilization. Both Justices reasoned that RPTL 421-g (6) unambiguously states that, with only one express exception not applicable here, any

---

[1] For ease of discussion, we refer to plaintiffs and defendants in each of these cases collectively.

[2] The luxury deregulation provisions permit the elimination of rent stabilization protections for certain high-rent housing accommodations upon vacancy or occupation by a high-income household when the rent has lawfully exceeded the statutory threshold (see RSL §§ 26-504.1, et seq.).

provisions of the RSL that limit the applicability of rent stabilization—including the luxury deregulation provisions—do not apply to buildings receiving section 421-g tax benefits.

The Appellate Division separately reversed both orders and granted defendants' motions for summary judgment to the extent of declaring that plaintiffs' apartments were properly deregulated and are not subject to rent stabilization (157 AD3d 556 [1st Dept 2018]; 161 AD3d 566 [1st Dept 2018]).  The Appellate Division held that the luxury deregulation provisions of the RSL apply to apartments in buildings receiving tax benefits under RPTL 421-g because, in the Court's view, section 421-g did "not create another exemption" to luxury deregulation.  The Court noted that, under its holding that "421-g buildings are subject to luxury . . . decontrol, . . . most, if not all, apartments in buildings receiving 421-g benefits would, in fact, never be rent-stabilized, because the initial monthly rents of virtually all such apartments were set, as here, at or above the deregulation threshold" (157 AD3d at 557).  Although the Court acknowledged that "courts should construe statutes to avoid objectionable, unreasonable or absurd consequences," it nevertheless concluded that the legislature intended for RPTL 421-g (6) to essentially nullify itself (id. [internal quotation marks and citation omitted]).

The Appellate Division granted plaintiffs leave to appeal to this Court, certifying the question of whether the orders of reversal were properly made.

II

Plaintiffs argue that the plain language of RPTL 421-g (6) makes clear that any provisions of the RSL that would otherwise operate to exempt apartments from rent regulation, apart from those provisions exempting cooperatives and condominiums, do not

apply to buildings receiving section 421-g tax benefits.  Under plaintiffs' reading of the statute, luxury deregulation does not apply to apartments in such buildings during the time period in which section 421-g tax benefits are extended.  For their part, defendants maintain that section 421-g renders the relevant dwelling units subject to the entire scheme of the RSL, including the luxury deregulation provisions which do not include a carve-out for buildings receiving section 421-g benefits.

In 1995, the legislature enacted section 421-g of the RPTL as part of a broad effort to revitalize lower Manhattan by providing financial incentives to convert commercial office buildings to residential and mixed-use buildings (see L 1995, ch 4).  To that end, the statute provides real property tax exemption and abatement benefits when a nonresidential building is converted to residential use.  RPTL 421-g (6) states, in pertinent part that,

> "[n]otwithstanding the provisions of any local law for the stabilization of rents in multiple dwellings or the emergency tenant protection act of [1974], the rents of each dwelling unit in an eligible multiple dwelling shall be fully subject to control under such local law, unless exempt under such local law from control by reason of the cooperative or condominium status of the dwelling unit, for the entire period for which the eligible multiple dwelling is receiving benefits pursuant to this section."[3]

That subdivision further directs that, after section 421-g benefits terminate,

> "such rents shall continue to be subject to such control, except that such rents that would not have been subject to such control but for this subdivision, shall be decontrolled if the landlord has included in each lease and renewal thereof for such unit for the tenant in residence at the time of such decontrol a notice in at least twelve point type informing such tenant that the unit shall become subject to such decontrol upon the expiration of benefits pursuant to this section" (RPTL 421-g [6]).

_____

[3] We hereinafter refer to the first clause of this sentence as the "notwithstanding clause."

"[W]hen presented with a question of statutory interpretation, our primary consideration is to ascertain and give effect to the intention of the [l]egislature" (Samiento v World Yacht Inc., 10 NY3d 70, 77–78 [2008], quoting Matter of DaimlerChrysler Corp. v Spitzer, 7 NY3d 653, 660 [2006]).  Inasmuch as "the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof" (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]; see Matter of Avella v City of New York, 29 NY3d 425, 434 [2017]).  As we have repeatedly explained, "courts should construe unambiguous language to give effect to its plain meaning" (Matter of DaimlerChrysler Corp., 7 NY3d at 660).  "Absent ambiguity the courts may not resort to rules of construction to [alter] the scope and application of a statute" because no such rule "gives the court discretion to declare the intent of the law when the words are unequivocal" (Bender v Jamaica Hosp., 40 NY2d 560, 562 [1976]; see also McKinney's Statutes § 94, Comment ["(t)he Legislature is presumed to mean what it says"]).[4]

---

[4] When, as here, the "question is one of pure statutory reading and analysis, dependent only upon accurate apprehension of legislative intent, we need not and do not defer to [an] agency in construing [a] statute'" (Matter of Ansonia Residents Assn. v New York State Div. of Hous. & Community Renewal, 75 NY2d 206, 214 [1989] [internal quotation marks and citation omitted]).  Thus, we decline to defer to a private advisory letter issued by the New York State Division of Housing and Community Renewal that defendants advance in support of their proffered reading.  Nor do we defer to the regulations promulgated by the New York City Department of Housing Preservation and Development upon which defendants rely (see 28 RCNY 32-02, 32-05 [a]), which add an exception for luxury deregulation that is not found in section 421-g (see Roberts v Tishman Speyer Props., L.P., 13 NY3d 270, 285 [2009]; compare Assessor's Manual, Exemption Administration, New York State Department of Taxation and Finance [listing only one exception for cooperatives and condominiums consistent with the language of the statute]).

The legislature's intention, as reflected in the language of the statute at issue here, is clear and inescapable. During "the entire period for which the eligible multiple dwelling is receiving" RPTL 421-g benefits, it "shall be fully subject to <u>control</u>" under the RSL, "<u>notwithstanding</u> the provisions of" that regime or any other "local law" that would remove those dwelling units from such control, "unless exempt under such local law from control by reason of the cooperative or condominium status of the dwelling unit" (RPTL 421-g [6] [emphasis added]).[5] The statute does not say that eligible units shall be fully subject to "<u>the provisions of</u>" any local law for the stabilization of rents. Put differently, the notwithstanding clause of the statute evinces the legislature's intent that any "local law for the stabilization of rents" that would exempt the unit from "control under such local law" does not apply to buildings receiving RPTL 421-g benefits, with the sole exception being for cooperatives and condominiums (see <u>People v Mitchell</u>, 15 NY3d 93, 97 [2010] [describing a notwithstanding clause as "the verbal formulation frequently employed for legislative directives intended to preempt any other potentially conflicting statute"]).

Defendants' contention, adopted by the dissent, that the notwithstanding clause was intended to import into RPTL 421-g (6) the entire RSL, including those provisions that would remove the units from control, cannot be squared with the statutory language. Indeed, if accepted, defendants' proffered construction would simultaneously render superfluous both the entire notwithstanding clause and the exception for cooperatives and

---

[5] Contrary to the dissent's assertion, the word "control," as used in this context, does not somehow encompass the antithetical concept of decontrol or, put differently, the absence of regulation (see dissenting op, at 7-8).

condominiums.  We reject defendants' suggestion that we read those provisions out of the statute (see Matter of Mestecky v City of New York, 30 NY3d 239, 243 [2017] ["meaning and effect should be given to every word of a statute and . . . an interpretation that renders words or clauses superfluous should be rejected" (internal quotation marks and citation omitted)]).  If the legislature intended to import the deregulation provisions of the RSL, it easily could have so stated (see Majewski, 91 NY2d at 583).

Moreover, defendants' reading of the statute fails to give effect to the language in RPTL 421-g (6) that provides a mechanism for a landlord to "decontrol" units that "would not have been subject to such control but for [that] subdivision," after section 421-g benefits have terminated.  That language clearly contemplates the suspension of decontrol provisions during the benefit period, further reaffirming what is unmistakably conveyed in the notwithstanding clause.  If defendants were correct that such units were already subject to decontrol under the RSL during the receipt of RPTL 421-g benefits, there would be no need to provide a mechanism to preserve the ability to implement decontrol after those benefits terminate.  Defendants and the dissent also fail to reconcile how, under their reading of the statute, some of the statutory exemptions from rent stabilization apply—such as those that exempt buildings renovated after 1974 (see RSL 26-504 [a] [1])—whereas others, including luxury deregulation, do not.[6]

_____

[6] Defendants contend that plaintiffs' interpretation of RPTL 421-g would sweep away too much, including section 2524.4 (c) of the Rent Stabilization Code, which provides that rent stabilization does not apply to a housing accommodation that is not occupied as a "primary residence" (9 NYCRR 2524.4 [c]).  However, as plaintiffs point out, that regulation provides grounds for an owner to evict a tenant who does not satisfy the primary residency

We further reject the reliance by defendants and the dissent on the luxury deregulation provisions themselves. Defendants and the dissent emphasize that, when the legislature enacted the luxury deregulation provisions in the RSL, it enumerated certain exceptions to such deregulation, including for buildings receiving benefits under RPTL 421-a and RPTL 489—both statutes with similar language to that included in section 421-g—yet, when the legislature enacted section 421-g two years later, it did not insert an additional exception in RSL § 26-504.2. Invoking the canon of statutory construction that enumerated exceptions are generally considered exclusive, they contend that the legislature's decision not to add section 421-g to the list of exceptions to luxury deregulation in the RSL is dispositive. We disagree.

RSL § 26-504.2 provides that the high rent accommodations exclusion "shall not apply to housing accommodations which became or become subject to this law (a) by virtue of receiving tax benefits pursuant to [RPTL 421-a] or [RPTL 489] . . . or (b) by virtue of article seven-C of the multiple dwelling law [the 1982 Loft Law]." Significantly, however, each of those programs was already in place when the RSL was amended to add the luxury deregulation provisions. Section 421-g, on the other hand, was enacted after RSL § 26-504.2 and, by its clear terms, unquestionably subjects apartments in buildings receiving section 421-g tax benefits to rent stabilization under the RSL regardless of any contrary provisions of the RSL that would otherwise result in deregulation. Because section 421-g

requirement; it does not provide a mechanism for changing the status of a rent-stabilized apartment.

itself excepted from luxury deregulation buildings receiving its benefits, the legislature did not also need to amend the RSL. The language of RPTL 421-g (6) made the legislature's intent clear. We decline defendants' invitation to construe the legislature's silence in one statutory scheme to override its clear intent, as plainly expressed, in another (see Matter of New York State Assn. of Life Underwriters v New York State Banking Dept., 83 NY2d 353, 363 [1994] ["(i)t is settled that inaction by the (l)egislature is inconclusive in determining legislative intent"]; People v Ocasio, 28 NY3d 178, 183 n 2 [2016] ["such inaction is susceptible to varying interpretations"]).

The statutory language unambiguously establishes the legislature's intent in this case, and the legislative history is not the to the contrary. In that regard, we reject the attempt by defendants and the dissent to acontextually use legislative history to "muddy clear statutory language" (Milner v Department of Navy, 562 US 562, 572 [2011]); see Wallace v New York, 40 F Supp3d 278, 314 n 34 [EDNY 2014] ["the isolated statements of . . . individual legislators—and more so, non-legislators—contained within the legislative history cannot establish legislative intent"]; see also Exxon Mobil Corp. v Allapattah Servs., Inc., 545 US 546, 569 [2005]; Doe v Pataki, 120 F3d 1263, 1277 [2d Cir 1997], cert denied 522 US 1122 [1998]). The letter from the Mayor to the Senate Majority Leader that is relied upon by the dissent begins by stating, "you asked that the legislation [which had already passed in the Assembly] be amended to ensure that any residential units created as a result of the legislation are subject to the most current Rent Stabilization Laws of the State [i.e., luxury decontrol]" (Mayor Letter, Bill Jacket, L 1995 ch 4 at 51). However, the language of the bill—which the Senator apparently found objectionable—

was never amended and the Mayor's letter does not serve to alter the language of the statute. Moreover, as the dissent acknowledges, other aspects of the legislative history can be read to demonstrate a contrary intention, including a memorandum in support of the bill from the Mayor's Director of State Legislative Affairs that pre-dated the bill's passage in the Assembly (Mem in Support, Bill Jacket, L 1995 ch 4 at 45). Additionally, contrary to defendants' argument, embraced by the dissent, the broad statutory purpose underlying section 421-g—to revitalize lower Manhattan—is not inconsistent with the stabilization of rents, which was plainly contemplated under the subdivision that we are called upon to interpret in these appeals. The goals of revitalization and increasing affordable housing stock are not mutually exclusive, and the language of subdivision (6) confirms that the legislature intended to further both aims when enacting section 421-g. Vague claims of contrary "government assurances" allegedly relied upon by developers receiving generous tax benefits (dissenting op, at 6) simply do not serve to alter the statutory text.

For all of these reasons, we conclude that apartments in buildings receiving tax benefits pursuant to RPTL 421-g are not subject to luxury deregulation. Plaintiffs' remaining contentions are rendered academic.

Accordingly, in appeal number 50, the order of the Appellate Division should be reversed, with costs, defendant 50 Murray Street Acquisition LLC's motion for summary judgment denied, plaintiffs' motion for partial summary judgment seeking a declaration in their favor granted, the case remitted to Supreme Court for further proceedings in accordance with this opinion, and the certified question answered in the negative. In appeal number 51, the order of the Appellate Division should be reversed, with costs, defendant

B.C.R.E. 90 - West Street, LLC's motion for summary judgment denied, plaintiffs' motion insofar as it sought summary judgment seeking a declaration in their favor granted, the case remitted to Supreme Court for further proceedings in accordance with this opinion, and the certified question answered in the negative.

Kuzmich et al. v 50 Murray Street Acquisition LLC; West et al. v B.C.R.E.-90 West Street, LLC, et al.

Nos. 50, 51

DiFIORE, Chief Judge (dissenting):

Rent stabilization is a critical government initiative designed to foster socioeconomic diversity and make New York City affordable for non-wealthy families. There is no dispute in this case that "rent stabilization" applies to buildings receiving Real

Property Tax Law (RPTL) § 421-g benefits. Although the Rent Stabilization Law was recently amended, during the time period relevant to these appeals an owner's ability to collect a market-based rent on luxury apartments leased to tenants with the means to afford them was an integral component of the rent stabilization scheme pursuant to the 1993 Rent Regulation Reform Act (RRRA). The question presented here is whether, when it adopted the Lower Manhattan Revitalization Plan (LMRP) in 1995, the Legislature intended to subject section 421-g buildings to an enhanced form of rent stabilization that precluded application of luxury decontrol to individual apartments. The Legislature determined that luxury decontrol was unavailable only with respect to three classes of buildings expressly identified by statute but not section 421-g buildings. Nevertheless – based on a purported plain text analysis of language that makes no mention of luxury decontrol – the majority retroactively confers this heightened form of rent stabilization on buildings receiving RPTL 421-g tax benefits. Because I agree with the unanimous decision of the Appellate Division that this approach misinterprets the statutory text, disregarding the broader regulatory scheme and legislative purpose of the relevant statutes, I respectfully dissent.

The majority glosses over the context in which the New York City government spearheaded the comprehensive legislation containing RPTL 421-g, despite its prominence in the legislative history. Unlike today, in the early 1990s Lower Manhattan was a depressed area. Businesses were fleeing at "an alarming rate" due in part to high taxes, economic development packages offered by neighboring regions, and the "antiquated" nature of Wall Street office space (Executive Chamber Mem, Bill Jacket, L 1995, ch 4 at

5-6). Aging skyscrapers increasingly stood empty – vacancy was at a post-World War II high, tax assessment values were "in a downward spiral," and decreasing tax revenues were causing multi-million-dollar losses for the City (NYC Office of the Mayor, Director of State Legislative Affairs Mem in Support, Bill Jacket, L 1995 ch 4 at 44-46). The City government determined that Lower Manhattan "demand[ed] . . . special attention," as worsening of this "deterioration" would "have damaging impacts on the economic well-being of the entire City" (id.). In response to this crisis, the Mayor of New York City supervised the crafting of the Lower Manhattan Revitalization Plan, a multi-faceted benefits package designed to entice businesses and the real estate industry to re-invest in Downtown and thus "reverse the decline in [its] economy" (id.). More specifically, it "addresse[d] the twin problems" manifested by the downturn – "an aging commercial building stock . . . and a high vacancy rate in those buildings" (id.). The drafters "carefully formulated" a set of tax benefits to implement two overarching strategies: "to stem the flow of businesses out of Manhattan . . . and to encourage alternative uses for obsolete commercial office buildings" (id.).

To achieve the first of these strategies, the plan sought to "stimulate office and retail leasing activity" in Lower Manhattan by "provid[ing] significantly lower occupancy costs for commercial tenants" in the form of commercial rent tax reductions, electricity cost rebates for commercial tenants, and a real property tax abatement for buildings that executed new commercial leases (id.). By reducing occupancy costs, the City intended to "place [the neighborhood] in an excellent position to retain existing businesses and attract

new ones," which it believed would, in turn, result in "retention of thousands of jobs and heightened economic activity" (id.).

To achieve the other major goal of the legislation – finding alternative uses for obsolete office towers – the plan encouraged the conversion of vacant commercial buildings to residential use (id.). The conversions were intended to "decrease the commercial vacancy rate" and "help create a 24-hour community, spurring the development of retail and entertainment uses that will be a new source of revenue for the City" (id.). To incentivize the developers in the private sector to make "major investments" in Lower Manhattan's building stock, the plan included two tax benefit programs. First, the program at issue here – enacted at RPTL 421-g – granted a 12-year property tax exemption and 14-year property tax abatement for commercial buildings converted to at least 75% residential use. Second, a 12-year property tax exemption was granted to buildings whose configuration made them suitable only for mixed commercial and residential use. Importantly, the City indicated that buildings receiving benefits under both programs "would be subject to rent stabilization during the benefit period" (id.). The regulatory scheme for rent stabilization as it stood then – contained largely in the Rent Stabilization Law of 1969 (RSL) – prescribed detailed rules limiting the types of buildings covered and provided a system of government oversight regarding both the rents that may be charged during rent stabilization and circumstances in which apartments could be transitioned to market rents under luxury decontrol. The fact that "rent stabilization" encompassed the entire regime in existence at that time, including its luxury decontrol

provisions adopted only two years before, was made clear when the LMRP legislation was before the Legislature. The measure was adopted in 1995.

In reliance on this statute, the property owners here – respondents in these actions or their predecessors in interest – purchased the subject buildings and applied for RPTL 421-g benefits. In December 2002, the West respondent purchased 90 West Street, a historic and architecturally significant building whose exterior is a designated landmark. Fifteen months prior to the purchase, the building suffered extensive damage in the September 11, 2001 terrorist attacks. At 90 West Street, debris from the South Tower of the World Trade Center located 100 yards away ruined the copper mansard roof and ornamented granite façade, and a fire that burned inside the building for over a week destroyed eight of its twenty-four floors. To purchase and renovate the building, the owner secured a roughly $100 million low-interest mortgage loan from the New York City Housing Development Corporation (HDC), a loan which it later refinanced. Before investing in the property, the new owner of 90 West Street received assurances from the New York City government that the entire rent stabilization regime – including its luxury decontrol provisions – would apply during the entire period that the owner received section 421-g benefits. An intensive renovation ensued, including the closely regulated repair of the historic exterior, which resulted in the creation of 410 new apartments from previously burned-out office space. 140 of those apartments – roughly one third – were leased below the rent threshold at which luxury decontrol could be applied and were thus treated as rent-regulated.

The property owner in <u>Kuzmich</u> purchased the subject buildings – 50 Murray Street and 53 Park Place – in 2014 for $540,000,000. By the time the current owner purchased the property, its predecessor had been receiving section 421-g tax benefits for ten years based on the earlier conversion of the building to residential use. All of the apartments had been initially leased at rents over the luxury decontrol threshold and, thus, consistent with the RSL, the rents for these apartments were not restricted. Like the property owner in <u>West</u>, the owner in <u>Kuzmich</u> sought and received government assurances that the luxury decontrol provisions of the rent stabilization scheme were both applicable and carried over from the prior owner's non-rent-regulated treatment of those apartments.

Appellant tenants rented apartments in 90 West Street, 50 Murray Street, and 53 Park Place at market rents, a status that was reflected in leases stating that the apartments were not rent-stabilized. Based on the most recent lease renewals, the rents for the relevant apartments ranged from $2,000 to $5,300 per month for the 90 West Street building and from $3,295 to $10,295 per month for the Murray Street and Park Place properties.

Construing RPTL 421-g(6) and the Rent Stabilization Law of 1969, incorporated therein, I disagree with the majority's conclusion that the luxury decontrol provisions of the RSL were inapplicable to section 421-g buildings. We all agree that, by virtue of the property owners' receipt of tax benefits under RPTL 421-g, subsection (6) of that statute conferred rent stabilization on the buildings – which otherwise would not have been subject to that regulatory scheme – while they received benefits. Subsection (6) states, in relevant part,

> "Notwithstanding the provisions of any local law for the stabilization of rents in multiple dwellings or the emergency tenant protection act of nineteen seventy-four [EPTA] the rents of each dwelling unit in an eligible multiple dwelling shall be fully subject to control under such local law, unless exempt under such local law from control by reason of the cooperative or condominium status of the dwelling unit, for the entire period for which the eligible multiple dwelling is receiving benefits pursuant to this section . . . ." (emphasis added).

In New York City, the primary "local law" governing rent stabilization is the Rent Stabilization Law. The prefatory phrase "notwithstanding other provisions of law" is generally used by the Legislature to preempt other conflicting statutes (see People v Mitchell, 15 NY3d 93, 97 [2010]). The only provisions of the RSL that would conflict with the imposition of that body of law to these newly renovated and converted buildings are the temporal limitations narrowing its reach to buildings completed or substantially rehabilitated between February 1, 1947 and January 1, 1974 (RSL § 26-504; EPTA § 5[a][5]).[1] On its face, therefore, subsection (6) extends "full[] . . . control" under the RSL to the apartments in 421-g buildings for the duration that the owner receives the tax benefits by using the "notwithstanding" prefatory phrase to supersede the RSL's temporal provisions.[2] Had the Legislature omitted the "notwithstanding" clause, the bare

---

[1] Rent control generally applies to units in buildings completed prior to February 1, 1947 in which the tenant has resided continuously since 1971 (NYC Admin Code § 26-403[e][2]).

[2] The statute also supersedes contradictory provisions of the Emergency Tenant Protection Act (ETPA), which, broadly speaking, authorized New York City to extend the RSL's rent stabilization regime to additional buildings not encompassed by the original RSL. The RSL now incorporates the ETPA by reference (see RSL § 26-504[b]).

incorporation of the Rent Stabilization Law would have had no practical effect because, by its terms, that law would not have reached LMRP buildings. The word "control" is defined as "the power or authority to guide or manage" or "the regulation of economic activity especially by government directive" (Merriam-Webster Online Dictionary, control, https://www.merriam-webster.com/dictionary/control). This plain text provides that apartments in section 421-g buildings fall within the governing or regulating power of the RSL, i.e., that they are subject to the rent stabilization scheme. There is no language in section 421-g(6) indicating that the Legislature intended to impose only a portion of the rent stabilization scheme – much less that it intended to exclude the critical luxury decontrol provisions in place at that time.

Passed as part of the 1993 RRRA, the luxury decontrol provisions in the RSL governing the tenancies at issue in these cases permitted deregulation of vacant apartments when rent reached a certain threshold (as relevant here, $2,000 per month) and occupied apartments when both the rent and the tenants' combined annual income exceeded certain threshold amounts (RSL §§ 26-504.1, 26.504.2, 26.504.3). The RSL contained provisions that specifically precluded the application of luxury decontrol to buildings "subject to the [RSL] (a) by virtue of receiving tax benefits pursuant to section [421-a] or [489] of the [RPTL] . . . , or (b) by virtue of article seven-C of the multiple dwelling law" (RSL §§ 26-504.1, 26-504.2[a]).[3] There was no similar exception for the RPTL 421-g program. None

---

[3] RPTL 421-a provides tax benefits to owners that build new-construction, multi-unit residential buildings on vacant land in certain areas of the City. RPTL 489 governs the "J-51" tax exemption program for building owners that complete certain projects, such as

was added to the luxury decontrol provisions when the Legislature enacted the RPTL 421-g program in 1995, two years after adopting luxury decontrol, nor had section 421-g buildings been exempted from luxury decontrol, despite subsequent amendments in 1997, 2000, 2003, 2011, and 2015. While we do not necessarily derive meaning from legislative "inaction," we place considerable significance on what the Legislature chooses to omit when it does act. Although the majority departs from this rule today, when a statute includes a list of exemptions we typically construe it as "evincing an intent to exclude any others not mentioned" (Walker v Town of Hempstead, 84 NY2d 360, 367 [1994]; Jericho Water Dist. v One Call Users Council, Inc., 10 NY3d 385, 391 [2008] ["exceptions to generally applicable statutory provisions should be strictly construed"]). Thus, in light of the Legislature's clear exemption of three other categories of building from luxury decontrol, the decision not to include section 421-g buildings in that list reflects an intent that they be fully subject to the entirety of the rent stabilization regulatory scheme, including its decontrol provisions. Had the Legislature intended to take the substantial policy step of exempting luxury decontrol, thereby imposing a specialized form of rent stabilization on section 421-g buildings, it could have – and would have – said so, as it did with respect to RPTL 421-a and 489 and Multiple Dwelling Law article 7-C buildings.

---

major capital improvements; and article 7-C of the Multiple Dwelling Law protects residents of converted loft buildings.

Notably, section 421-g(6) contains language substantively identical to the language in RPTL 421-a(2)(f) – and was obviously modeled after that provision.[4] If, as the majority contends, the "control" language common to both sections 421-a(2)(f) and 421-g(6) unambiguously excludes the application of the luxury decontrol provisions on eligible buildings, then why did the Legislature expressly exempt RPTL 421-a buildings from luxury decontrol in a separate statute? The fact that the Legislature considered it necessary to create a statutory exemption to luxury decontrol for section 421-a apartments demonstrates that it understood that, absent such exemption, the entirety of the RSL – including luxury decontrol – would apply to them. Its decision not to include section 421-g buildings in the exemption should be given that effect. But, today, the majority adopts a construction that either reads the essentially identical statements in sections 421-a and 421-g to mean two different things or renders the language specifically exempting section 421-a apartments from luxury decontrol superfluous. This strongly suggests that its purported plain language analysis misses the mark.

The majority asserts that the specific exemptions for RPTL 421-a and other buildings is a product of timing, i.e., that they reflect legislative concern that the provisions conferring rent stabilization on those buildings would fail to preclude luxury decontrol – not because of their language – but merely because they were enacted before luxury

_____

[4] Section 421-a(2)(f) provides: "Notwithstanding the provisions of any local law for the stabilization of rents in multiple dwellings or the [EPTA], the rents of a unit shall be fully subject to control under such local law or such act, unless exempt under such local law or such act from control by reason of the cooperative or condominium status of the unit . . ."

decontrol existed.  But, when subsequent legislation impacts the operation of an existing statute, we presume the Legislature was aware of this effect and we interpret the statute according to its plain language, notwithstanding the timing of its enactment (see Matter of Mancini v Office of Children & Family Servs., 32 NY3d 521, 530 [2018] [although Worker's Compensation Law § 15(3)(v), a preexisting statute, expressly incorporated section 15(3)(w), which was later amended, "the Legislature necessarily altered the operation of paragraph (v) . . . there was simply no need for the Legislature to add language to paragraph (v) to reflect changes in paragraph (w) because paragraph (v) already wholly incorporated paragraph (w)'s . . . regime"]).  The more compelling explanation for the Legislature's failure to expressly exempt section 421-g buildings from luxury decontrol is the obvious one – luxury decontrol was intended to apply to these properties.[5]

---

[5] The same is true under Public Housing Finance Law § 654-d(18).  Although the majority ignores this issue, I agree with the Appellate Division that, in West, the building owner was entitled to a declaration that it was not precluded from utilizing luxury decontrol based on its receipt of low-interest mortgages from HDC pursuant to the Public Housing Finance Law (PHFL).  PHFL 654-d(18) states, in relevant part:

> "Notwithstanding the provisions of . . . the emergency housing rent control law, the local emergency housing rent control act, or local law enacted pursuant thereto, all dwelling units in a multiple dwelling . . . which is financed by a mortgage loan. . . except for [cooperative and condominium units], shall be subject to the [RSL]" (emphasis added).

The statute unqualifiedly subjects the apartments in eligible buildings "to the rent stabilization law."  Thus, PHFL 654-d(18) – like RPTL 421-g(6) – confers the entirety of the RSL, including its luxury decontrol provisions, on buildings subject to its terms. Further, it is not listed among the statutory exceptions to luxury decontrol and, here, the majority cannot rely on the timing of the statute's enactment in an attempt to explain the omission.  PHFL 654-d was enacted in 1992, one year before the 1993 RRRA (L 1992, ch 702).  Thus, when the Legislature amended the RSL to include the luxury decontrol regime,

Moreover, the majority is incorrect that the "decontrol" provisions of subsection (6) "clearly contemplate[] the suspension of decontrol provisions during the benefit period" (majority op at 7)  Because subsection (6) subjects some apartments (those with rents below the decontrol threshold) to rent stabilization but provides that this rent stabilization ends at the close of the benefit period, the Legislature mandated that notice procedures be followed prior to this type of decontrol.  Indeed, all apartments that are stabilized pursuant to a tax benefit statute are eligible for decontrol at the conclusion of the benefit period, regardless of whether they meet other decontrol criteria in the RSL.  But this avenue for decontrol in no way forecloses other avenues – i.e., luxury decontrol – prior to the close of the benefit period, unless luxury decontrol provisions have been expressly exempted, which did not occur here.

The majority also cites language in subsection (6) indicating that rent stabilization does not apply to units in section 421-g buildings "exempt . . . from control by reason of . . . cooperative or condominium status," asserting that this represents the sole exception to rent limitations intended by the Legislature.  The majority affords too much weight to this language which, if anything, supports my interpretation outlined above.  Again, RPTL 421-g(6) largely tracks RPTL 421-a(2)(f).  The condominium/cooperative clause in section 421-a(2)(f), added in 1981, has long been interpreted to "constitute a mere clarification of the pre-existing law that rent stabilization laws do not apply [to cooperatives and

it was fully aware of the PHFL's imposition of rent stabilization on eligible buildings, yet it did not include PHFL buildings among those expressly exempted from luxury decontrol.

condominiums]" (<u>Fasa Props. v Freidus</u>, 103 AD2d 729, 729 [1st Dept 1984]), indicating

that the language making units "fully subject to control" under the RSL – the same

language the Legislature later used in section 421-g(6) – imported preexisting exceptions

to rent regulation.

Because the Legislature is "presumed to be familiar" with existing case law, "where

a statute has been interpreted by the courts, the continued use of the same language by the

Legislature subsequent to the judicial interpretation is indicative that the legislative intent

[was] correctly ascertained" (<u>Matter of Knight-Rider Broadcasting v Greenberg</u>, 70 NY2d

151, 157 [1987]). When, after the <u>Fasa</u> decision, the Legislature enacted section 421-g

using substantively identical language as in section 421-a, it signaled approval of that

court's conclusion that the condominium/cooperative clause was merely explanatory,

rather than a separate substantive exemption. The condominium/cooperative language is

not relevant to this case. It adds nothing to any party's position.

Far more significant is the legislative history of the LMRP, which the majority

largely ignores. The bill jacket contains a letter from the Mayor of New York City, the

proponent of the legislation, to the Senate Majority Leader, clarifying:

> "In our discussion you asked that the legislation be amended to
> ensure that any residential units created as a result of the
> legislation are subject to the most current Rent Stabilization
> Laws of the State. I have discussed this matter with the drafters
> of the legislation and with the Commissioner of the
> Department of Housing Preservation and Development (HPD),
> the City agency responsible for implementing the residential
> conversion program proposed in the legislation. The City's
> intention has always been that dwelling units in property
> receiving benefits under the residential conversion program . .

> . would be subject to rent stabilization to the same extent as, but to no greater extent than, other rent regulated property . . . Thus, the provisions of the [RRRA] of 1993 that provide for the exclusion of high rent accommodation and for high income rent decontrol would apply to property receiving benefits under the programs created by the Lower Manhattan legislation" (Mayor Letter, Bill Jacket, L 1995 ch 4 at 51-52).

During the Senate debate, this letter was read into the legislative record, and comments made on the floor reflect an understanding that the entirety of rent stabilization, including luxury decontrol, would apply to section 421-g buildings. In fact, the only Senator to vote against the bill opposed the legislation partly on those grounds, noting it would "subsidize the conversion of commercial space . . . which is going to be luxury housing." Letters from associations representing buildings and property owners submitted to the Governor in support of the legislation likewise note that the 1993 RRRA would apply to residential units created under the program (Bill Jacket, L 1995 ch 4 at 20, 49-50). Nothing in the bill jacket supports the contrary interpretation now adopted by the majority.[6] We routinely cite materials of this type as evidence of legislative intent and have decided cases on legislative history far less elucidating than these statements (see e.g. Matter of Diegelman v City of Buffalo, 28 NY3d 231, 240 [2016]; Matter of Manouel v Board of Assessors, 25 NY3d 46, 52 [2015]; People v Mills, 11 NY3d 527, 534-35 [2008]; Council of City of N.Y. v Giuliani, 93 NY2d 60, 70 [1999]; Nowlin v City of New York, 81 NY2d 81, 87 [1993]).

---

[6] The lone statement in the memorandum submitted to the Assembly and Senate by the Mayor's office that "rent stabilization" would apply to section 421-g buildings is not to the contrary. As explained, rent stabilization did and does apply to these buildings. Nothing in that statement suggests that the luxury decontrol provisions of the scheme would be excluded.

But, today, these statements are disregarded by the majority, which dismisses them with a reference to inapposite federal precedent.

Even viewed more broadly, the legislative history of the Lower Manhattan Revitalization Plan offers a simple explanation for why the Legislature treated section 421-g buildings differently than some other buildings subjected to rent stabilization by receipt of tax benefits. The aim of this legislation was not the creation of affordable housing. Rather, section 421-g was enacted to address an economic crisis in the City: the real estate depression in Lower Manhattan. The legislative history materials emphasize – for both the broader revitalization plan and for section 421-g – the economic recovery of the neighborhood. Indeed, a significant portion of the revitalization plan was intended to incentivize commercial, not residential, leasing. Further, the conversion of old office space to apartments was specifically designed to decrease building vacancy by finding a new use for obsolete buildings, re-build the City's tax base, and promote growth in retail and entertainment spaces to generate revenue.

To be sure, requiring property owners granted tax benefits to comply with the RSL – from which they would have otherwise been entirely exempt based on the post-1974 renovation dates – reflects the legislative extraction of a benefit from the real estate industry on behalf of tenants. Indeed, the record reflects that, between 1994 and 2012, almost 2,500 rent stabilized units were added to the housing stock by virtue of the section 421-g

program.[7] But the critical compromise reflected in the legislative history materials was the provision of tax benefits in order to incentivize developers to undertake "major investments" (i.e., substantial conversions and renovation projects) in a risky neighborhood.

Consistent with the statute's plain language and clear legislative history, HPD promulgated regulations providing that luxury decontrol applied to section 421-g buildings while they receive benefits (see Rules of City of New York Housing Preservation and Development § 32-05 ["Exempt Dwelling Units" – defined in section 32-02 as including units exempt under the 1993 RRRA – are not rent stabilized under the section 421-g program]). Likewise, the New York State Division of Housing and Community Renewal (DHCR) (responsible for administering rent stabilization) has repeatedly issued informal guidance consistent with HPD's interpretation, stating that "high-rent deregulation is available with respect to Sec. 421-g units" and that, further, "high-rent deregulation is available from the inception of the first residential tenancy" such that property owners need not wait until the vacancy of the first tenant to treat a converted unit as deregulated (see Jan. 30, 1997 DHCR letter at 1-2; see also Aug. 22, 2000 DHCR letter at 1; Sept. 26, 2002 DHCR letter at 1).

---

[7] Although I agree with its holding, the Appellate Division's statement in the Kuzmich decision that "most, if not all, apartments in these buildings would, in fact, never be rent stabilized" (Kuzmich v 50 Murray Street Acquisition LLC, 157 AD3d 556, 557 [1st Dept 2018] [emphasis added]) is puzzling. It is clear from the record that apartments were subjected to restricted rents as a result of this program – in fact, in the West building alone, nearly one-third of the apartments had regulated rents because they did not meet the criteria for luxury decontrol.

While, as the majority correctly notes, agency rules and guidance are not entitled to deference in this pure statutory interpretation case, they cannot be dismissed as irrelevant. HPD promulgates regulations pursuant to a traditional notice-and-comment procedure, but neither plaintiffs nor the majority have provided any evidence that anyone ever construed section 421-g(6) as precluding application of luxury decontrol to section 421-g buildings during receipt of tax benefits. To the contrary, it is clear from HPD's promulgated rules and forms, as well as DHCR's informal guidance, that the agencies most closely involved in the implementation of the section 421-g program and the property owners subject to that program (not to mention the tenants that agreed to market-rate rents) shared a common understanding – that the entirety of the RSL applied to section 421-g buildings, including its luxury decontrol provisions.

Property developers were induced by a legislative benefits package to purchase and convert obsolete, empty office buildings into apartments, in a depressed and empty neighborhood that had no residential community to speak of. Both property owners here submitted sworn affidavits stating that they consulted government agencies (including HPD) as to whether luxury decontrol would apply as part of their due diligence process and were "consistently advised" that it would. They relied on these representations, in addition to the DHCR guidance and legislative history, in purchasing and financing the properties. Indeed, they averred that the availability of luxury decontrol was a "key component" in their decisions as, without it, their investments in the buildings would not have made "economic sense."

In 1995, there was no guarantee that renters could be drawn to Lower Manhattan, and the developers bore that risk. But to the benefit of the City and State, the section 421-g program worked. There is now a robust 24-hour community in Lower Manhattan, as hoped. The program succeeded in part because property owners believed – consistent with the text of the statute, its legislative history and government guidance – that the rent stabilization law would function as it did almost everywhere else in the City and, thus, would include luxury decontrol. It is worth noting that the majority's decision today may unfairly subject these property owners to substantial liability for rent overcharges in direct contravention of the representations that mobilized the real estate industry to transform Lower Manhattan in the first place.

The majority's holding will lead to results antithetical to the Legislature's aims in enacting both New York City's rent stabilization scheme and the 1995 Lower Manhattan Revitalization Plan. Soon, tenants of Lower Manhattan buildings who agreed to lease luxury apartments at market rates (in this case, at up to $10,000 per month; and in the cases that will inevitably follow, at potentially higher rents) will converge on DHCR in an attempt to collect refunds, based on the majority's conclusion that their apartments should have been rent-stabilized for years. Those "overcharge" refunds will be assessed against property owners (or their successors in interest) promised by government that they could lease the tenants' luxury apartments at market rents after purchasing and developing previously-empty buildings in exchange for section 421-g tax benefits. This destabilization of the decades-old RPTL 421-g and PHFL 654-d programs does nothing to further the

worthy policies of rent stabilization and is unlikely to result in the inclusion of any additional apartments in the rent stabilization program. Even worse, the next time government looks to the private sector and asks developers to take risk and finance a revitalization program, potential investors will think twice about relying on a common sense reading of legislation, clear legislative history and the representations of implementing agencies – none of which protected them here from the majority's retroactive reading of statutory text that dramatically changes the terms of the bargain long after the Legislature's goals have been achieved. For all of these reasons, I respectfully dissent.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

For Case No. 50: Order reversed, with costs, defendant's motion for summary judgment denied, plaintiffs' motion for partial summary judgment seeking a declaration in their favor granted, case remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein and certified question answered in the negative. Opinion by Judge Stein. Judges Rivera, Fahey, Garcia, Wilson and Feinman concur. Chief Judge DiFiore dissents and votes to affirm in an opinion.

For Case No. 51: Order reversed, with costs, defendant B.C.R.E. 90 - West Street, LLC's motion for summary judgment denied, plaintiffs' motion insofar as it sought summary judgment seeking a declaration in their favor granted, case remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein and certified question answered in the negative. Opinion by Judge Stein. Judges Rivera, Fahey, Garcia, Wilson and Feinman concur. Chief Judge DiFiore dissents and votes to affirm in an opinion.

Decided June 25, 2019