People ex rel. Ellis v Imperati (2025 NY Slip Op 03646)

People ex rel. Ellis v Imperati

2025 NY Slip Op 03646

Decided on June 17, 2025

Court of Appeals

Halligan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on June 17, 2025

No. 54

[*1]The People & c. ex rel. Andrew T. Ellis, & c., Respondent,
v
Kirk Imperati, & c., Appellant.

Anna K. Diehn, for appellant.
Andrew D. Ellis, for respondent.
Grace X. Zhou, for amicus curiae Attorney General.

HALLIGAN, J.:
Michael Cavagnolo was arrested and charged with making a terroristic threat after he repeatedly called the Hyde Park Police Department emergency line threatening to commit violent acts against officers, their families, and Police Department property. County Court fixed bail pursuant to CPL 510.10 (4) (a). That paragraph makes bailable all violent felony offenses listed in Penal Law § 70.02, with two specific exceptions. One of the offenses listed in Penal Law § 70.02 is the crime of making a terroristic threat (see Penal Law § 70.02 [1] [c]). Paragraph (g) of CPL 510.10 (4), however, makes bailable the felony crimes of terrorism defined in Penal Law article 490 but expressly excludes the crime of making a terroristic threat.
Although these two paragraphs are difficult to reconcile, the text and disjunctive structure of CPL 510.10 (4) indicate that paragraph (g) was not intended to narrow the independent authorization provided in paragraph (a) to set monetary bail for all violent felony offenses listed therein. We therefore hold that making a terroristic threat is a bail-eligible offense. Accordingly, we reverse.
I
In March 2024, Mr. Cavagnolo was arrested and charged with one count of making a [*2]terroristic threat in violation of Penal Law § 490.20 [FN1]. The felony complaint alleged that in a series of calls to the Hyde Park Police Department emergency line, Mr. Cavagnolo made repeated threats of violence, including to the police dispatcher and her family. He threatened to shoot police officers, to use hand grenades, guns, and gasoline on the Police Department, and to blow up department property. The bill of particulars additionally alleges that after his arrest, while at the booking area of the police precinct, Mr. Cavagnolo told the officers that he would "shoot" them "in the head" and would "kill them and their families." County Court determined that making a terroristic threat constitutes a bail-qualifying offense pursuant to CPL 510.10 (4) (a) and set bail. Petitioner commenced this habeas corpus proceeding, contending that the offense does not qualify for bail because it is explicitly excluded under paragraph (g) of subdivision 510.10 (4).
The Appellate Division granted the petition and ordered Mr. Cavagnolo's release (226 AD3d 1069 [2d Dept 2024]). The Court held that even though the crime of making a terroristic threat is defined by statute as a violent felony, the authority conferred by CPL 510.10 (4) (a) to set bail for violent felony offenses does not extend to this particular offense because CPL 510.10 (4) (g) explicitly excludes it. According to the Appellate Division, paragraph (g) is a more specific provision than paragraph (a) and therefore controls, and the contrary reading would render paragraph (g)'s exclusionary language superfluous.
One Justice dissented, explaining his view that the "specific trumps the general" canon does not apply because both paragraphs (a) and (g) are specific: (a) specifically identifies Penal Law § 490.20 as a bail-qualifying offense by incorporation of Penal Law § 70.02, and paragraph (g) specifically identifies Penal Law § 490.20 as not qualifying (see id. at 1073-1076 [Miller, J., dissenting]). The dissent concluded that the statute authorizes trial courts to fix bail for the crime of making a terroristic threat, and that the opposite conclusion was objectionable given the nature and severity of the crime.
Mr. Cavagnolo ultimately pleaded guilty to one count of making a terroristic threat and was sentenced to five years of imprisonment and five years of post-release supervision [FN2]. This Court granted the People leave to appeal.
II
Paragraphs (a) and (g) of CPL 510.10 (4) were adopted in 2019 as part of sweeping bail reform that eliminated cash bail for all but a set of specified crimes (see L 2019, ch 59, § 1, part JJJ, § 2, codified at CPL 510.10 [4]). For those crimes, termed "qualifying offenses," the court has the discretion to "fix bail, or order non-monetary conditions in conjunction with fixing bail" (CPL 510.10 [4]). For all other crimes, the court must release the defendant on their own [*3]recognizance, or, if the court finds that will not reasonably ensure the defendant's return to court, release the defendant "under non-monetary conditions" (CPL 510.10 [3]).
Qualifying offenses are set forth in twenty-one separate paragraphs, each of which describes a particular category of crime for which bail may be imposed. Paragraph (a) makes bailable violent felony offenses, with two express exceptions. It does so by reference to Penal Law § 70.02, which enumerates a list of such offenses. Paragraph (a) states:
"A principal stands charged with a qualifying offense . . . when he or she stands charged with . . . a felony enumerated in section 70.02 of the Penal Law, other than robbery in the second degree as defined in subdivision one of section 160.10 of the Penal Law, provided, however, that burglary in the second degree as defined in subdivision two of section 140.25 of the Penal Law shall be a qualifying offense only where the defendant is charged with entering the living area of the dwelling" (CPL 510.10 [4] [a]).
Among the violent felony offenses listed in Penal Law § 70.02 is making a terroristic threat in violation of Penal Law § 490.20—the offense with which Mr. Cavagnolo was charged (see Penal Law § 70.02 [1] [c]).
As originally enacted, paragraph (a) of CPL 510.10 (4) included two exceptions providing that second-degree robbery and second-degree burglary, despite being listed in Penal Law § 70.02, did not qualify for bail (see L 2019, ch 59, § 1, part JJJ, § 2). The provision was amended a year later to allow bail for second-degree burglary if the defendant is charged with entering the living area of the dwelling, while continuing to exclude all other charges of burglary in the second degree (see L 2020, ch 56, § 1, part UU, § 2).
Paragraph (g) of CPL 510.10 (4) makes the following terrorism-related crimes qualifying offenses:
"money laundering in support of terrorism in the first degree as defined in section 470.24 of the Penal Law; money laundering in support of terrorism in the second degree as defined in section 470.23 of the Penal Law; money laundering in support of terrorism in the third degree as defined in section 470.22 of the Penal Law; money laundering in support of terrorism in the fourth degree as defined in section 470.21 of the Penal Law; or a felony crime of terrorism as defined in article four hundred ninety of the Penal Law, other than the crime defined in section 490.20 of such law" (CPL 510.10 [4] [g]).
Two of these money laundering offenses ("money laundering in support of terrorism in the third degree as defined in section 470.22 of the Penal Law" and "money laundering in support of terrorism in the fourth degree as defined in section 470.21 of the Penal Law") were not included in paragraph (g) as originally enacted, but were added by the legislature at the same time it amended paragraph (a) to make bailable second-degree burglary if the defendant allegedly entered the living area of the dwelling (L 2020, ch 56, § 1, part UU, § 2). None of the amendments to CPL 510.10 (4), either in 2020 or subsequent years, address the crime of making a terroristic threat.
[*4]III
This review of the statutory text makes plain the question presented: Is the crime of making a terroristic threat bailable, where paragraph (a) of CPL 510.10 (4) includes the offense, but paragraph (g) excludes it? Put differently, did the legislature mean to import paragraph (g)'s exclusion into paragraph (a)?
As with any question of statutory interpretation, our task is " 'to ascertain and give effect to the intention of the legislature' " (Matter of Town of Southampton v New York State Dept. of Envtl. Conservation, 39 NY3d 201, 209 [2023], quoting Matter of Mestecky v City of New York, 30 NY3d 239, 243 [2017]). We start with the text, which is the " 'clearest indicator' " of legislative intent (id., quoting Kuzmich v 50 Murray St. Acquisition LLC, 34 NY3d 84, 91 [2019]). "When the statutory language at issue is but one component in a larger statutory scheme, it must be analyzed in context and in a manner that harmonizes the related provisions and renders them compatible" (Matter of Mestecky, 30 NY3d at 243 [internal quotation marks omitted]). "Our duty, after all, is to construe statutes, not isolated provisions" (King v Burwell, 576 US 473, 486 [2015] [internal quotation marks omitted]).
CPL 510.10 (4) sets forth a disjunctive list. Each paragraph is separated from the others by a semicolon, and the final two paragraphs are separated by the word "or" (see CPL 510.10 [4] [t]-[u]). "Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise" (Reiter v Sonotone Corp., 442 US 330, 339 [1979]; see also Garcia v United States, 469 US 70, 75 [1984] [noting the "terms" at issue "are made separate and distinct from one another by Congress' use of the disjunctive"]). Critically, elements in a disjunctive list are typically "not intended to modify" each other, as doing so would "rob" an element "of its independent and ordinary significance" (Reiter, 442 US at 338-339). Here, this disjunctive structure confirms that the legislature intended each paragraph in CPL 510.10 (4), including (a) and (g), to set forth a separate and distinct category of offenses identified as "qualifying" for purposes of monetary bail. One paragraph does not modify another.[FN3]
Further support for this view is found in "the substance of . . . the items on the list and the way they interact, as against relevant background understandings" (Pulsifer v United States, 601 US 124, 140-141 [2024]). CPL 510.10 (4) lists twenty-one categories of bailable crimes, each independent of the others and serving a distinct "concrete function" (id. at 143). Paragraph (a)'s [*5]function is to make bailable the violent felony offenses enumerated in Penal Law § 70.02, with the express exceptions of second-degree robbery and certain second-degree burglary offenses. There is no indication that the legislature intended to dilute that objective by importing an exclusion from a different paragraph dealing with a different category of crimes.[FN4]
Other features of the statute confirm that the legislature intended each paragraph to stand alone, and did not intend CPL 510.10 (4) to be read as a conjunctive whole. First, there is significant overlap among various paragraphs in CPL 510.10 (4). For example, paragraph (d) includes class A felonies defined in various provisions of the Penal Law, and several of those felonies are also separately set forth in paragraph (g) (compare CPL 510.10 [4] [d] [deeming bail-eligible certain "class A felon[ies] defined in the penal law" including violations of Penal Law §§ 490.27, 490.28, 490.45, 490.50, and 490.55], with CPL 510.10 [4] [g] [deeming bail-eligible violations of Penal Law §§ 490.27, 490.28, 490.45, 490.50, and 490.55 by reference to Penal Law article 490]). Similarly, certain felony sex offenses enumerated in paragraph (e) are also violent felony offenses deemed bailable by paragraph (a) (see e.g. Penal Law § 230.34-a ["Sex trafficking of a child"]) or class A felony offenses bailable under paragraph (d) (see e.g. Penal Law § 130.96 ["Predatory sexual assault against a child"]). These redundancies suggest the legislature did not consider how each of the paragraphs relate to each other, making it unlikely that it meant for an exclusion included in one paragraph to be engrafted onto another.[FN5]
Second, the inclusion of exceptions and qualifications in numerous paragraphs (see CPL 510.10 [4] [a], [d], [f], [g], [h], [k], [p], [t]) reflects careful and discrete consideration of each paragraph's scope and any appropriate exceptions. Paragraph (a) offers an example: the legislature initially excluded second-degree robbery and burglary from the list of qualifying violent felonies, and then further refined that list in a 2020 amendment by restoring second-degree burglary with entry into a living area as a bailable offense (see L 2020, ch 56, § 1, part UU, § 2). At the same time, the legislature also amended paragraph (g) to include additional money laundering offenses in support of terrorism (id.). Had the legislature intended to exempt making a terroristic threat from the violent felonies covered by paragraph (a), it could have said so explicitly in that paragraph, as [*6]it did by carving out the exceptions for second-degree robbery and certain second-degree burglary offenses (see Stefanik v Hochul, 43 NY3d 49, 69 [2024] ["the inclusion of [ ] provisos or exemptions is generally considered to deny the existence of others not mentioned"] [internal quotation marks omitted]). Alternatively, the legislature could have expressly instructed that paragraph (g)'s exclusion of the crime applies throughout CPL 510.10 (4), notwithstanding conflict with another paragraph. But the legislature did neither. Given those drafting choices, it seems unlikely that the legislature intended to implicitly import paragraph (g)'s exclusion into paragraph (a).
The legislative history of Penal Law article 490 and CPL 510.10 (4) offers no basis for a contrary view. Article 490 was enacted immediately after September 11, 2001 (see L 2001, ch 300, § 4). Intended "to ensure that terrorists, as well as those who solicit or provide financial and other support to terrorists, are prosecuted and punished in state courts with appropriate severity," it criminalizes certain terrorism-related activities (id.). The article's legislative history does not discuss bail. As noted, CPL 510.10 (4)'s current framework for setting bail was enacted in the 2019 bail reform bill. The subdivision initially included nine paragraphs, each enumerating a different category of crimes for which a trial court could set bail (see L 2019, ch 59, § 1, part JJJ, § 2). That list was expanded to twenty-one paragraphs through subsequent amendments (see L 2020, ch 56, § 1, part UU, § 2; L 2022, ch 56, § 1 part UU, subpart B, § 2; see also L 2023, ch 56, § 1, part VV, subpart A, § 2). Nothing in the legislative history of these amendments addresses the terrorism-related offenses included in paragraph (g).
We address several additional points made by the dissent and the Appellate Division [FN6]. Each relies on the principle that a general provision must yield to a specific one (see dissenting op. at 5-8), but close examination reveals that canon does not apply here. Neither paragraph (a) nor (g) is "general." Each paragraph includes a reference to the specific crime of making a terroristic threat. The only distinction is that one does so by incorporation via Penal Law § 70.02, which enumerates violent felonies, and the other directly references the offense. That difference does not make the first general and the second specific.[FN7]
The dissent also argues, and the Appellate Division concluded, that if paragraph (g)'s [*7]exclusion does not apply to paragraph (a), then the exclusion is superfluous (see dissenting op. at 10-12). But as we have explained, each paragraph of CPL 510.10 (4) confers distinct authority to set monetary bail for the qualifying crimes identified in that particular paragraph. The exclusion in paragraph (g) simply means that authority to impose bail under that paragraph because an offense is a crime of terrorism does not extend to the crime of making a terroristic threat. At the same time, paragraph (a) confers authority to impose bail for all violent felonies as defined in Penal Law § 70.02, including making a terroristic threat, with the specific exceptions of second-degree robbery and certain second-degree burglary offenses. Given the statutory structure, which evinces independent determinations about different categories of offenses, we see no indication that the legislature intended paragraph (g)'s exclusion to supersede the authority expressly granted in paragraph (a) to treat making a terroristic threat as a bailable offense.
IV
In conclusion, we hold that CPL 510.10 (4) (a) authorizes a court to set monetary bail for a person charged with making a terroristic threat under Penal Law § 490.20. Petitioner's argument that the Appellate Division erred in imposing non-monetary conditions when ordering Mr. Cavagnolo's release is not properly before us and we do not consider it (see Oden v Chemung County Indus. Dev. Agency, 87 NY2d 81, 89 [1995]).
Accordingly, the Appellate Division judgment should be reversed, without costs, habeas corpus proceeding converted to a declaratory judgment action and judgment granted in accordance with this opinion.

WILSON, Chief Judge (dissenting):

A woman and her service dog arrive at the Bronx Zoo on a beautiful Saturday. When she arrives at the entrance, she sees two signs. One says, "ABSOLUTELY NO ANIMALS ALLOWED." The other says, "NO DOGS ALLOWED, EXCEPT SERVICE DOGS." She knows three other things: (1) the signs were authorized by the head zookeeper, so there is no question as [*8]to their authority; (2) they were created and installed simultaneously, so there is no question that one is outdated; and (3) there is and will be no one to help her interpret them—she's on her own. Is she allowed to enter with her dog? The majority says she can't because each sign is independent. If that makes sense to you, there's no point in reading further. And, actually, if that doesn't make sense to you, there's also no point in reading further. But if you're unsure, or if you just like reading or dogs or signs, read on.
I.

Is making a terroristic threat a crime for which the Legislature decided bail could be imposed? That question is the same as it is for my zoo example. In 2019, the Legislature passed and the Governor signed the Bail Reform Act (see L 2019, ch 59, § 1, part JJJ, § 2). They did so in response to the unduly long periods of time persons accused of crimes were being held in pretrial detention at Rikers Island, which was then and is now subject to federal court supervision because of overcrowding and inadequate facilities and personnel [FN1]. A catalyst for the Bail Reform Act was the case of a 16-year-old named Kalief Browder, who was accused of stealing a backpack, held in pretrial detention at Rikers Island for three years, never convicted of any crime, and committed suicide shortly after his release.[FN2]
The Bail Reform Act largely eliminated cash bail and specified a finite set of more serious offenses for which bail may still be set (see People ex rel. Rankin v Brann, 41 NY3d 436, 441 [2024], citing L 2019, ch 59, § 1, part JJJ, § 2, CPL 510.10 [4]). For all other offenses, subject to a few limited exceptions, the defendant must be released pending trial, potentially on non-monetary [*9]conditions (CPL 510.10 [3]; see id.). 
As the majority sets out, the Bail Reform Act initially contained nine subparagraphs, (4) (a) - (4) (i), that identified bail eligible crimes; over the course of successive amendments, the Act contained twenty-one subparagraphs (majority op at 10-11). The two subparagraphs in question here, (4) (a) and (4) (g), were part of the original Bail Reform Act. They said two somewhat different things:[FN3]
"A principal stands charged with a qualifying offense for the purposes of this subdivision when he or she stands charged with:"

4 (a)

4 (g)

"a felony enumerated in section 70.02 of the penal law, other than burglary in the second degree as defined in subdivision two of section 140.25 of the penal law or robbery in the second degree as defined in subdivision one of section 160.10 of the penal law,"
"money laundering in support of terrorism in the first degree as defined in section 470.24 of the penal law; money laundering in support of terrorism in the second degree as defined in section 470.23 of the penal law; or a felony crime of terrorism as defined in article four hundred ninety of the penal law, other than the crime defined in section 490.20 of such law"

The "crime defined in section 490.20" of the Penal Law is the crime at issue here: making a terroristic threat. Subparagraph (4) (g) refers to it directly. Subparagraph (4) (a) does not. Instead, it refers to section 70.02 of the Penal Law, which lists section 490.20 among the more than 80 crimes identified therein as violent felonies. The majority reasons that because subparagraph (4) (a) (with two exclusions) covers every "felony enumerated in section 70.02 of the Penal Law," the specific exclusion of making a terroristic threat contained in subparagraph (4) (g) is meaningless. It is clear that the more specific (4) (g) overcomes the more general (4) (a). Whether we think of this as informed by our canons of construction, by the practicalities of the legislative drafting process or by common sense, the Legislature has specifically determined that making a terroristic threat is not bail eligible.
II.
A.
We, like most other courts, have a longstanding rule of statutory construction that if general and particular provisions in the same statute are incompatible, the particular provision controls (see e.g. Mental Hygiene Legal Serv. v Sullivan, 32 NY3d 652, 658 [2019] ["(U)nder principles of statutory construction, whenever there is a general and a specific provision in the same statute, the general applies only where the particular enactment is inapplicable"], citing Matter of Perlbinder Holdings, LLC v Srinivasan, 27 NY3d 1, 9 [2016], citing McKinney's Cons Laws of NY, Book 1, Statutes § 238; see Cons Laws § 238, at 404-406 ["The particular provision . . . is considered . . . an exception to the general where the two are incompatible, and so far as the particular intention is applicable, the general intention yields"]). The majority acknowledges that rule, but discounts it on the theory that both provisions are specific. I cannot agree.
Subparagraph (4) (a) is a very general catch-all. It does not name any crimes (except the two it excludes)—it identifies its coverage by referring to a different, preexisting statute (Penal Law 70.02) that serves a purpose unrelated to bail. The question is not whether Penal Law 70.02 is specific, but whether subparagraph (4) (a) is. Subparagraph (4) (a) is like the zoo sign referring to "animals"—general. It would not help if, for example, the sign instead said "animals as defined in the Merriam Webster Dictionary, Revised Edition," or "domestic animal as defined in section 188 (7) of the Agriculture and Markets Law." The sign would still be general when compared to the companion sign specifically excluding service dogs. Penal Law 70.02 covers a multitude of offenses (over 80 unique offenses, spanning many categories of crimes). In contrast, in drafting (4) (g), the Legislature was focused on terrorism-related crimes only—that is what the section concerns. The exclusion in (4) (g) is even narrower; it covers a single offense.
The majority insists that our settled rule of construction "does not apply here," because both provisions "include a reference to the specific crime of making a terroristic threat" (majority op at 11). But the proper question is not whether the crime is specific, but whether the provision is. A specific provision targets a narrower subject with more detail; a general provision applies more broadly, and with less detail (see e.g. Cons Laws § 238 ["General statutes . . . in the absence of contrary intention, do not overreach particular prohibitions founded on special reasons of policy or convenience, and an explicit statement in a later statute may even control general language of an earlier enactment"]; Muck v Hitchcock, 212 NY 283, 286 [1917] [holding that the broad references to "corporations" in the Religious Corporations Law applied only to domestic, not foreign corporations]). Subparagraph (4) (g) contains a specific reference to the crime of making a terroristic threat; subparagraph (4) (a) does not.
The majority's argument is incompatible with both common sense and our settled doctrine. The majority contends that because (4) (a) references Penal Law 70.02, "which enumerates violent felonies," (4) (a) is just as specific as (4) (g), which "directly references the offense" (majority op at 11). As explained previously, "the crime defined in section 490.20" is contained in the text of (4) (g); it is not in the text of (4) (a). In (4) (a), the Legislature deliberately chose to reference a broad class of offenses (violent felonies) rather than enumerate the individual offenses or categories of offenses within that class. Instead, the Legislature used the subsequent subparagraphs to delineate the categories and identify the qualifying offenses within each. "A felony enumerated in section 70.02 of the Penal Law" is broad; "the crime defined in section 490.20" is narrow.
The majority attempts to distinguish Matter of Perlbinder Holdings, LLC (27 NY3d 1 [2016]; see majority op at 11, n 7), by claiming that the provisions here, unlike the provisions in that case, are both specific. In that case, we held that a provision in the New York City Charter broadly authorizing appeals from decisions of the Department of Buildings (DOB) did not apply to the specific circumstance of applications for zoning variances, the procedures for which were enumerated in a more specific provision. But applications for variances are a form of appeals from DOB decisions on zoning applications; they constitute a subset within the broader category of all DOB decision appeals. Thus, we held that the provision concerning that subset controlled over the general provision authorizing appeals. That holding applies here: (4) (a) involves a broad circumstance (whether a violent felony qualifies for bail), whereas the exclusion in (4) (g) concerns a "highly specific" circumstance (whether "the crime defined in section 490.20" qualifies for bail). When faced with the specific circumstance, the provision governing that specific circumstance controls.
Another way to understand why subparagraph (4) (a) is general is to note that it sweeps in changes to Penal Law 70.02 that occur after subparagraph (4) (a) was enacted, and will continue to do so as the content of Penal Law 70.02 changes in the future. For example, after the effective date of subparagraph (4) (a), the Legislature amended Penal Law 70.02 to add "criminal manufacture, sale, or transport of an undetectable firearm, rifle or shotgun as defined in section 265.50;" and "aggravated strangulation as defined in section 121.13-a." (see L 2024, ch 23, § 5). This further demonstrates that subparagraph (4) (a) is general, catching whatever happens to be in Penal Law 70.02 at the time a bail decision is made, whereas subparagraph (4) (g) is specific—always exempting making a terroristic threat (only). A sign that says "please return all gym equipment to its proper place" is general: it applies to whatever equipment exists as equipment is added or removed. A sign that says "place all dumbbells back in the appropriately numbered slots by weight" is, by contrast, specific.
B.
Rather than follow our settled principles of statutory construction, the majority creates a new canon of selective disjunctiveness for our consideration: where two provisions conflict, pretend one of the provisions does not exist. That is, when the woman reads the two zoo signs, she must conclude that the broader "ABSOLUTELY NO ANIMALS ALLOWED" excludes her service dog, because it indisputably covers all animals, including dogs, regardless of what the other sign says. What is the worth of such a canon? Suppose, instead, that the zoo had the following single sign:
THE FOLLOWING PERSONS WILL BE PROSECUTED:
PERSONS ENTERING THE ZOO WITH ANIMALS; OR
PERSONS ENTERING THE ZOO WITH FIREARMS; OR
PERSONS ENTERING THE ZOO WITH ALCOHOLIC BEVERAGES; OR
PERSONS ENTERING THE ZOO WITH DOGS, EXCEPT FOR SERVICE DOGS.
The "disjunctive" nature of the sign—using "or" and semicolons, does not reveal anything about the legislature's intent. Because the sign, like the statute at issue, has some inconsistency, our job is to do our best to discern the author's intent. Most people reading the above sign would believe the zoo intended to allow people with service dogs to enter—not that the first clause would override the exception for service dogs because of the use of "or" and semicolons.
The majority contends that a "disjunctive list" reading of CPL 510.10 (4) implies that each [*10]subparagraph should be read independently and that the subparagraphs are "'not intended to modify'" one another (majority op at 7, citing Reiter v Sonotone Corp., 442 US 330, 339 [1979]). The majority concludes that there is therefore "no indication" that the Legislature intended to compromise (4) (a)'s function "by importing an exclusion from a different [sub]paragraph dealing with a different category of crimes" (id. at 8).
However, the majority offers no explanation for why (4) (a) can be read to overcome (4) (g), but not vice versa. If both are equally effective, independent provisions, (4) (a) is no more powerful than 4 (g). Reading (4) (g) independently would clearly carve out "the crime as defined in section 490.20" from the list of felony terrorism offenses that qualify for bail. In other words, the majority's approach cannot explain why interpreting each provision as "disjunctive" would lead to the conclusion that "the crime defined in section 490.20" is bail eligible. Instead, considering each provision separately more clearly leads to the conclusion that the Legislature considered the category of terrorism offenses on its own terms and determined that 490.20 would not be bail eligible. Perhaps the majority believes that only provisions that include should be given a "distinct, concrete function," not those that exclude. However, the majority's theory does not support that conclusion and the majority provides no basis in the legislative history or statutory structure to explain why its theory of disjunctiveness operates only in one direction, so that (4) (a) overrides the clear exclusion in (4) (g), but not vice versa.[FN4]
The majority's interpretation runs afoul of yet another canon of construction, because it renders the exclusion in (4) (g) entirely superfluous (see Kimmel v State, 29 NY3d 386, 393 [2017] ["a statute should be construed to avoid rendering any of its provisions superfluous"]). A simple test for whether something is superfluous is whether removing it would produce the same effect (cf. Merriam-Webster Online Dictionary, superfluous [defining "superfluous" as "not needed" or "exceeding what is sufficient or necessary"] [http://www.merriam-webster.com/dictionary/superfluous] [accessed May 27, 2025]). Removing the exclusion in (4) (g) would make no difference under the majority's interpretation: someone accused of making a terroristic threat could be held on bail whether (4) (g) exists or not. It is unreasonable to assume the Legislature enacted text with no meaning (see e.g. People v Galindo, 38 NY3d 199, 205 [2022] ["'effect and meaning must, if possible, be given to the entire statute and every part and word thereof'"], citing Cons Laws § 98 [a]). Conversely, giving effect to (4) (g) does not render (4) (a) [*11]superfluous: (4) (a) still is necessary to cover many offenses not covered elsewhere in the bail law.[FN5]
The majority explains that its interpretation does not render the exclusion superfluous, because, for the crime of making a terroristic threat, a court looking at the Bail Reform Act legislation would conclude it could impose bail by the circuitous route of (4) (a) to Penal Law 70.02 to 490.20, but not by the more direct route of (4) (g) to Penal Law 490.20. But whether an offense qualifies for bail is binary: an offense either qualifies or it does not. Whether by cross-reference to Penal Law 490.20 through subparagraph (4) (a)'s reference to Penal Law 70.02, or directly by subparagraph 4 (g)'s reference to Penal Law 490.20, the underlying crime is set out in Penal Law 490.20, and it is either bailable or not. Nothing the majority says explains why a bail court's authority or decisionmaking when faced with someone accused of violating Penal Law 490.20 would be any different if the exclusion in subparagraph (4) (g) did not exist. The majority's interpretation wipes out the exclusion and leaves it with no practical effect. If the "ABSOLUTELY NO ANIMALS ALLOWED" sign bars a service dog from the zoo, the allowance for service dogs in the other sign is totally superfluous—the zoo might as well remove the sign.
III.

Let's put the canons away. As the majority acknowledges, our task when interpreting statutes is to do our best to determine what the Legislature wanted. The majority's decision requires one to view the Legislature as having done the following. First, when enacting the Bail Reform Act, the Legislature specified in subparagraph (4) (a) that of the more than 80 felonies then listed in CPL 70.02—which were listed not for purposes of bail, but to classify felonies by severity for sentencing purposes—would be bail eligible. Then, the Legislature took the trouble to provide in subparagraph (4) (g) that making a terrorist threat would not be bail eligible. Third, when it did so, it believed that specific exclusion in subparagraph (4) (g) would have no effect. The majority's view that this best expresses the Legislature's intent reflects a very dim view of legislative competence.
Section 70.02 of the Penal Law long predates the 2019 bail reform legislation. Titled "Sentence of imprisonment for a violent felony offense," in subsection 1 it classifies more than 80 violent felonies in categories ranging from B (more severe) to E (less severe). In subsection 2, it sets out the authorized sentences for each category, and in subsection 3 it sets out the terms of sentences for each category. One of those enumerated felonies, listed as class D, is "making a terroristic threat as defined in section 490.20." Section 70.02 was not enacted with bail eligibility in mind or for any purpose relating to bail; its purpose was to set out the legally allowable sentences for violent felonies.
Turning back to the Bail Reform Act, the majority acknowledges, as it must, that subparagraph (4) (g) "expressly excludes the crime of making a terroristic threat" (majority op at 2). However, the majority says we must disregard the Legislature's specific exclusion of that crime because each subparagraph should be read independently, with each serving a "distinct, 'concrete function'" (majority op at 9, quoting Pulsifer v United States, 601 US 124, 140-41 [2024]). According to the majority, a "disjunctive" reading—giving each subparagraph standalone significance—means that the exclusion in subparagraph (4) (g) is effectively overridden by subparagraph (4) (a), which provides that a violent felony—of which making a terroristic threat is one—constitutes a qualifying offense.
It helps to approach the legislative intent question with a dose of common sense. When the Legislature wrote, in (4) (a), that all of the 80+ felonies listed in Penal Law 70.02 would be bail eligible,[FN6] it saved itself the trouble of enumerating each of those in the bail reform legislation. Doing so also allowed for the future automatic determination of new violent felonies as bail eligible without the need to amend the bail law. That is, the Legislature started from two propositions: the vast majority of violent felonies would be bail eligible; and violent felonies should presumptively default to bail eligibility when changes to Penal Law 70.02 were later adopted. Then, the Legislature took up the task of fine tuning that general assessment, which is what it did: as part of the Act itself in the next six subparagraphs of section 4 ([b] - [g]), and over time in the next fourteen ([h] - [t]). As part of the drafting of the initial Bail Reform Act, when the Legislature got to the point of considering terrorism-related felonies, which appear in Penal Law sections 490.00-490.70, it itemized how it wished terrorism-related crimes to be treated for purposes of bail. Even though the catch-all in subparagraph (a), by incorporating the felonies listed in Penal Law 70.02, already captured numerous terrorism-related violent felonies,[FN7] the Legislature then considered terrorism-related felonies specifically in subparagraph (4) (g), where it did two things. First, because subparagraph (4) (a), through incorporation of all the violent felonies in Penal Law 70.02, captured only those terrorism-related felonies that were violent, subparagraph (4) (g) provided that every [*12]"felony crime of terrorism as defined in article four hundred ninety of the penal law" would be bail eligible, thus capturing terrorism-related crimes not listed in Penal Law 70.02 as violent felonies. Then, in the same sentence, the Legislature expressly stated that "the crime defined in section 490.20"—making a terroristic threat—would not be bail eligible.
So, in determining legislative intent, we are left with two options. One is the majority's view, which is that the Legislature decided, in subparagraph (a), that everything listed in Penal Law 70.02—including making terroristic threats—was bail eligible, and then went to the trouble of creating a subparagraph specific to terrorism that expressly excluded terroristic threats as bail eligible, expecting that language to have no effect whatsoever. My view, instead, is that for matters of drafting convenience and both present and future expediency, the Legislature concluded that sweeping in everything in Penal Law 70.02—violent felonies—would be a good starting point, and then carefully created subdivisions to tailor its judgment about what else to include and what else to exclude. My view represents good legislative drafting: a general provision in subparagraph (a) that takes in all violent felonies as then and in the future defined as such in Penal Law 70.02, with specific exclusions and additions itemized in many successive subparagraphs [FN8]. The majority's view assumes the Legislature drafted poorly, adding a specific exclusion it knew to be meaningless, or carelessly did not recognize as meaningless.
IV.

The majority's remaining arguments do not allow us to disregard subparagraph (4) (g)'s exclusion. First, the majority points to the "significant overlap among various [sub]paragraphs in CPL 510.10 (4)" (majority op at 8), contending that that overlap supports its argument that the Legislature "did not consider how each of the [sub]paragraphs relate" and did not intend "for an exclusion included in one [sub]paragraph to be engrafted onto another" (majority op at 9). The majority's argument undermines its own conclusion. If the Legislature did not consider how the subparagraphs related to each other, then by that logic, it also would not have been aware of or attentive to any conflict between to subparagraphs (4) (g) and (4) (a). Why would a legislature that "did not consider how each of the [sub]paragraphs relate" intend for the broad inclusion in one subparagraph to override any exclusions or limitations it delineated in any of the other twenty subparagraphs?
Although I agree with the majority that there is redundancy in the statutory scheme, I disagree with the majority that the redundancy suggests that the exclusion has no force. Returning to my zoo example, the admonition in the second sign that no dogs are allowed is redundant of the "ABSOLUTELY NO ANIMALS ALLOWED" sign, but the fact that it is tethered to the exception for service dogs reflects that when the zookeeper stopped thinking about animals generally and instead focused on dogs, the zoo created a sign with some redundancy but with a clear exception tied to the redundant statement. Nothing about the overlap suggests that the exception was meant to be disregarded.
Instead, the overlap here reflects precisely what I view as the commonsense legislative drafting process. The Legislature identified a large class of offenses that presumptively would be included (violent felonies), then proceeded through various categories of crimes one by one to delineate which crimes within the category would be bailable. Any redundancy was not an issue because the Legislature likely assumed that, when faced with a question of whether an offense qualified, a court would zero in on the subparagraph dealing with that particular category of offense. Likely, the Legislature was aware that making a terroristic threat was also a violent felony, but did not view (4) (a) and (4) (g) as conflicting at all: the Legislature presumed that any reader of the statute, in determining whether making a terroristic threat qualified for bail, would refer to the subparagraph concerning terrorism offenses and understand that the language designating as bail eligible numerous terrorism crimes, "other than" making a terroristic threat, meant that making a terroristic threat was ineligible for bail, just as the zoo did not mean to bar a service dog.
Second, the majority points to the inclusion of exceptions and qualifications in many subparagraphs, which it argues reflects the Legislature's "careful and discrete consideration of each subparagraph's scope and any appropriate exceptions" (majority op at 9). Again, that observation supports my view, not the majority's. If the Legislature's decision to craft exceptions in each subparagraph was careful and deliberate, we should give more weight to the careful consideration of crimes of terrorism than to the wholesale inclusion of all violent felonies.
Third, the fact that (4) (a) expressly excepts two violent felony offenses (forms of burglary and robbery) from qualifying for bail does not shed light on the meaning of (4) (g)'s exclusion (see majority op at 9-10). As the Attorney General explained in her brief, those two particular exclusions in subparagraph (a) were put front and center because those were the two crimes of which Kalief [*13]Browder was accused and which resulted in his prolonged pretrial detention at Rikers Island [FN9]. Notably, those crimes are not exempted in another subparagraph, and no subparagraph addresses those categories of crimes. On the majority's reading, the Legislature would have had to exclude Penal Law § 490.20 from both (4) (a) and (4) (g) to give its exclusion effect—an approach that would create true (and pointless) redundancy [FN10]. If the zoo's "ABSOLUTELY NO ANIMALS ALLOWED" sign had instead said, "ABSOLUTELY NO ANIMALS ALLOWED EXCEPT FOR POLICE HORSES," and the second sign remained as it was, my analysis would be no different: the decision to place police horses in a more prominent position may have been done to alert zoogoers that such horses might be present, and in any event would not detract from the second sign allowing persons with service dogs to enter.
Finally, the majority contends that the legislative history "offers no basis for a contrary view" (majority op at 10), which observation, if true, would apply equally to my interpretation. Because the Bail Reform Act was part of the budget bill, there is no formal legislative history concerning it, and it is therefore fair to say that the legislative history of the Bail Reform Act does not cut either way. Although not legislative history of the Bail Reform Act or subparagraphs (4) (a) or (4) (g) per se, the Legislature has amended paragraph (4) multiple times after enacting it—including an amendment to subparagraph (4) (g) to include additional money laundering offenses (L 2020, ch 56, § 1, part UU, § 2; see majority op at 6). The fact that the Legislature has amended subparagraph (4) (g) but has not touched the exclusion of Penal Law 490.20, supports the idea that subsequent Legislatures knew of the provision, examined the subdivision, and decided not [*14]to strike the exclusion. Had the zookeeper amended the second sign to read, "NO DOGS OR CATS ALLOWED, EXCEPT FOR SERVICE ANIMALS," we would tend to think that when the zoo amended the sign to include cats, the continuation of the service animal exception meant something, even if it is not legislative history of the highest order.
V.

As the majority notes, the crime of making of terroristic threat was enacted after September 11, 2001, and, along with other terrorism-related crimes, intended "to ensure that terrorists . . . are prosecuted and punished in state courts with appropriate severity" (L 2001, ch 300, § 4). Excluding crimes like Mr. Cavagnolo's from being eligible for bail may be a repugnant result to some—perhaps it is to the majority. However, it is up to the other branches of government, not the courts, to determine what crimes are bail eligible. Giving effect to the exclusion does not produce an absurd result or one contrary to public policy [FN11]. Courts are not entitled to substitute their own policy preferences when the statutory text is clear (see People v Roberts, 31 NY3d 406, 418 [2018], citing People v Robinson, 95 NY2d 179, 182 [2000] ["If the words chosen have a 'definite meaning, which involves no absurdity or contradiction, then there is no room for construction and courts have no right to add or take away from that meaning'"]).
The Legislature that passed the Bail Reform Act decided that the crime of making of terroristic threat would not be a bail-eligible offense. Because the majority's interpretation admittedly renders the plain language in subparagraph (4) (g)'s exclusion nugatory, I dissent.
Judgment reversed, without costs, habeas corpus proceeding converted to a declaratory judgment action and judgment granted in accordance with the opinion herein. Opinion by Judge Halligan. Judges Garcia, Singas and Cannataro concur. Chief Judge Wilson dissents in an opinion, in which Judge Troutman concurs. Judge Rivera dissents, joins Sections I, II (A), III and V of the dissenting opinion, and further agrees that the majority's construction renders language in CPL 510.10 (4) (g) superfluous.
Decided June 17, 2025

Footnotes

Footnote 1: Mr. Cavagnolo was subsequently indicted for seven counts of this offense.

Footnote 2: Mr. Cavagnolo's judgment of conviction rendered habeas corpus relief unavailable, as he is no longer in respondent's custody. But because the question of statutory interpretation presented is novel, is likely to recur, and will typically evade our review, we convert the proceeding to a declaratory judgment action and apply the mootness exception to reach the question (see People ex rel. Rankin v Brann, 41 NY3d 436, 442 n 4 [2024]; People ex rel. McManus v Horn, 18 NY3d 660, 664 n 2 [2012]).

Footnote 3: The dissent asserts that the legislature first drafted paragraph (a), and then "fine tune[d]" the inclusion of violent felonies enumerated in Penal Law § 70.02 by drafting the next twenty paragraphs (see dissenting op. at 13-15). There is no indication that paragraph (a) was drafted first, or that it was designed to function as a broad category with the remaining paragraphs under subdivision (4) carving out various exceptions. The text, in fact, suggests otherwise. Paragraph (a) incorporates "violent felonies" enumerated in Penal Law § 70.02. Class A felonies are not included in that list, though. Instead, class A felonies are made bailable under a different paragraph (see CPL 510.10 [4] [d]). Similarly, paragraph (q) makes bailable, among other things, "a crime involving bail jumping" (CPL 510.10 [4] [q]). Those paragraphs add entirely different categories of offenses and cannot be described as "fine tuning" a broad-brush decision to make violent felonies bailable.
Footnote 4: Although the dissent suggests that our reading subordinates paragraph (g) to paragraph (a) (dissenting op. at 9-10), our construction best gives both paragraphs independent effect. The dissent's interpretation, by contrast, would nullify the legislature's determination that all violent felonies except the two offenses expressly denoted in paragraph (a) should be bailable.

Footnote 5: Under the dissent's construction, paragraph (g)'s exclusion would presumably modify the plain language not just of paragraph (a), but also paragraph (r), which makes bailable "any felony offense committed by the principal while serving a sentence of probation or while released to post release supervision," and paragraph (s), which makes bailable "a felony, where the defendant qualifies for sentencing on such charge as a persistent felony offender pursuant to section 70.10 of the penal law" (CPL 510.10 [4]).
Footnote 6: Neither the dissent's lengthy musings about imaginary signs (dissenting op. at 1-2, 5-6, 8-9, 12, 17-20) nor its scattershot invocation of other canons of construction (dissenting op. at 8-12) persuades. As explained, the canons do not apply as the dissent would suggest. Moreover, the dissent's mechanical application of the canons ignores that they "can assuredly be overcome by other indicia of meaning" (Barnhart v Thomas, 540 US 20, 26 [2003]). Here, the best indication of meaning is the disjunctive structure of the statute.
Footnote 7: Matter of Perlbinder Holdings, LLC v Srinivasan (27 NY3d 1 [2016]), on which the dissent and the Appellate Division rely, is inapposite. That case involved one provision that conferred broad powers to hear appeals from a city agency and another that applied specifically to requests for a Zoning Resolution variance. By contrast, paragraph (a) of CPL 510.10 (4) is directly applicable to the question whether making a terroristic threat is a bailable offense, just as is paragraph (g).

Footnote 1: See Benjamin Weiser, New York City Settles Suit Over Abuses at Rikers Island, NY Times, June 22, 2015, https://www.nytimes.com/2015/06/23/nyregion/new-york-city-settles-suit-over-abuses-at-rikers-island.html; Hurubie Meko, Outside Official Will Take Over Deadly Rikers Island Jail, Judge Orders, NY Times, May 13, 2025, https://www.nytimes.com/2025/05/13/nyregion/rikers-island-receiver-nyc.html.

Footnote 2: Michael Schwirtz & Michael Winerip, Kalief Browder, Held at Rikers Island for 3 Years Without Trial, Commits Suicide, NY Times, June 8, 2015, https://www.nytimes.com/2015/06/09/nyregion/kalief-browder-held-at-rikers-island-for-3-years-without-trial-commits-suicide.html; see Jesse McKinley & Ashley Southall, Kalief Browder's Suicide Inspired a Push to End Cash Bail. Now Lawmakers Have a Deal, NY Times, Mar. 29, 2019, https://www.nytimes.com/2019/03/29/ nyregion/kalief-browder-cash-bail-reform.html ["The move to sharply curtail the use of cash bail, in many ways, was the long-awaited response to the case of Mr. Browder, who was only 16 in 2010 when he was arrested on charges he stole a backpack in the Bronx. Unable to pay his bail, he spent three years in jail, two of them in solitary confinement, as his trial date was repeatedly postponed . . . For many left-leaning politicians, he is a symbol of the problems inherent in the bail system, which they argue discriminates against the poor"]; see e.g. Assemblywoman Catalina Cruz, Regular Session Part 1, New York State Assembly, Mar. 31, 2019 at 468-69 ["there are people right now sitting in jail because they cannot afford bail"]).

Footnote 3: Subsequently, subparagraph (4) (a) was amended to curtail partially the exclusion for burglaries, and subparagraph (4) (g) was amended to add two charges of money laundering crimes committed in support of terrorism. The language quoted here is what appeared in the original 2019 Act (see Ch. 59, pt. JJJ, § 2, 2019 N.Y. Laws 541, 634 [eff. Jan. 1, 2020]).
Footnote 4: The majority's unsupported observation that the Legislature intended the statute to be read not as a whole but instead intended "each [sub]paragraph to stand alone" (majority op at 8) is at odds with yet another of our canons of construction that statutes should be interpreted as an integrated whole, and contradicts the majority's own statement that "[o]ur duty . . . is to construe statutes, not isolated provisions'" (majority op at 7, quoting King v Burwell, 576 US 473, 486 [2015]; see e.g. Alcantara v Annucci, 42 NY3d 142, 148 [2024] ["We start with the statutory language, the clearest indicator of the legislative intent, and we construe the statute as a whole and consider its various provisions together and with reference to each other"]; Mancini v Office of Child. & Fam. Servs., 32 NY3d 521, 525 [2018] ["(P)rovisions of an integrated statutory scheme must be considered as a whole, with each component viewed in relation to the others"]). 

Footnote 5: The majority claims that its construction "best gives both [sub]paragraphs independent effect" (majority op at 8 n 4). However, the majority again fails to explain how its interpretation gives (4) (g)'s exclusion "independent effect." The majority also claims that my approach "nullif[ies] the legislature's determination that all violent felonies except the two expressly denoted in [sub]paragraph (a) should be bailable" (id.). However, the majority's choice of words undercuts its own critique: my approach gives meaning to (4) (a)'s inclusion of all violent felonies "except" those "expressly denoted"; (4) (g) expressly denotes making a terroristic threat as nonbailable.
Footnote 6: See infra at 19-20 for an explanation of the two exclusions originally appearing in subparagraph (4) (a).

Footnote 7: Those listed in Penal Law 70.02, and thereby rendered bail eligible under subparagraph (a) of the 2019 bail reform legislation, are: hindering prosecution of terrorism in the first degree as defined in section 490.35, criminal possession of a chemical weapon or biological weapon in the second degree as defined in section 490.40; criminal use of a chemical weapon or biological weapon in the third degree as defined in section 490.47; soliciting or providing support for an act of terrorism in the first degree as defined in section 490.15, hindering prosecution of terrorism in the second degree as defined in section 490.30; criminal possession of a chemical weapon or biological weapon in the third degree as defined in section 490.37; soliciting or providing support for an act of terrorism in the second degree as defined in section 490.10; and making a terroristic threat as defined in section 490.20.
Footnote 8: The majority challenges my view of the legislative drafting process for two reasons: first, the majority asserts that "[t]here is no indication that [sub]paragraph (a) was drafted first"; and second, it asserts that there is no indication "that it was designed to function as a broad
category with the remaining [sub]paragraphs under subdivision (4) carving out various exceptions" (majority op at 7-8, n 3). As to the majority's first reason, the majority mistakes my structural argument for a legislative history argument: my explanation about how the Legislature approached the drafting process does not concern the timing of when the provisions were written, but rather, merely reflects a structural and commonsense reading of the text that sheds light on their drafting approach (see infra at 21-22). As to the second reason, the majority again misinterprets my argument. I do not contend that (4) (a) is the sole "general" subparagraph in subdivision CPL 510.10 (4) or that all other subparagraphs "except" from it. As I explain, (4) (a) is a broad catch-all—it reflects much of what the Legislature intended to accomplish—but the provisions that follow may vary in their level of generality relative to one another. That is, the precedence among subparagraphs (g), (r) and (s) is not raised here, and I have not, necessarily or by implication, decided the precedence among them (see majority op at 9 n 5). The question here concerns only the relationship between subparagraph (4) (a) and the specific exclusion in (4) (g); the majority's observation that Class A felonies are made bailable under a separate subparagraph (see majority op at 7-8 n 3) is entirely irrelevant to that question. Class A felonies follow a different sentencing structure from B to E felonies and are classified in a separate penal law provision (see Penal Law § 70.00); thus, it is entirely reasonable that the Legislature would opt to incorporate them under a separate paragraph, CPL 510.10 (4) (d).
Footnote 9: See McKinley & Southall, Kalief Browder's Suicide Inspired a Push to End Cash Bail. Now Lawmakers Have a Deal, supra n 2.

Footnote 10: In support of its reading, the majority cites language from Stefanik v Hochul (43 NY3d 49, 69 [2024]). The quoted language concerns the applicability of a canon that is irrelevant to this case: the canon of expressio unius est exclusio alterius (see majority op at 10). In Stefanik, we held that that canon did not apply; however, we explained that that canon is properly used "to resolve ambiguity in a statute by looking to what a legislature has expressly included to conclude that other, dissimilar items were meant to be excluded" (Stefanik, 43 NY3d at 69). We explained that the canon "applies with particular force where a statute creates provisos or exemptions, because 'the inclusion of such provisos or exceptions is generally considered to deny the existence of others not mentioned'" (id.). As it applies here, that canon tells us two things—neither of which supports the majority's reliance on it. First, it tells us that (4) (a)'s exclusion of certain forms of robbery and burglary mean that the forms of robbery and burglary not listed are presumed included. Second, it tells us that (4) (g)'s exclusion of section 490.20 from the list of eligible felony terrorism crimes tells us that all other felony terrorism crimes are presumed included. That canon does not support the majority's apparent use of it to argue that the omission of an exception for section 490.20 from (4) (a) means that the specific exclusion in (4) (g) should be given no effect.
Footnote 11: One can imagine various reasons the Bail Reform Act exempted section 490.20, the only terrorism offense that criminalizes speech with no additional conduct. Laws regarding pretrial detention balance public safety and the risk of flight, on one hand, with the potential deprivation of individual liberty prior to receiving due process, on the other. Because section 490.20 criminalizes the content of speech, the Legislature could have reasonably concluded that this added weight to the balance of the liberty interests at stake (cf. Counterman v Colorado, 600 US 66, 73-78 [2023] [discussing First Amendment limits in true-threat prosecutions and the concerns with chilling protected expression]). Inchoate terrorism crimes could still be bail eligible where, for example, a defendant was charged with conspiracy or attempt.